# CHARLESTON.

## HUMPHREYS v. RALEIGH COAL & COKE CO.

### Submitted January 6, 1914.  Decided January 14, 1914.

1. MASTER AND SERVANT—*Duty of Mine Operator—Safety of Employe.*
   The mine foreman statute of this state does not absolve the mine owner or operator from his common law duty to exercise reasonable care to provide reasonably safe machinery, tools and appliances for use in the mine and make the mine a reasonably safe place for work, except in so far as the duty is devolved upon the mine foreman, nor from liability for injury resulting to a servant in the mine from his failure to make such provision, or his provision of defective or unsafe appliances, or his failure of duty as to the safety of the mine as a place of work in those instances in which such duty is not cast upon the mine foreman. (p. 498).

2. SAME—*Injury to Servant—Defective Instrumentalities.*
   An uninsulated wire carrying a heavy electric voltage, connected at one end with a trolley wire in a mine entry, extending from it through a break-through into an air course, neither of which is used as a way for travel or place of ordinary work, carried along the rib or wall of the break-through on wooden pins near its top, less than four feet from the floor, and used to supply electric power to a

73 W. Va.

pump in the air course, attended by a workman called a pump run-ner, is a dangerous appliance or instrumentality, and ' renders the place in which it is a dangerous place of work, and, for injury inflicted by it upon a servant called into the break-through to assist in moving the pump, without knowledge of its condition, the mine owner is liable   (p. 499).

3.  ELECTRICITY—*Personal Injuries—Liability.*

A person using the silent mysterious force called electricity, whose presence in deadly quantity cannot ordinarily be detected by any of the five senses without danger, in a place to which he knows others may resort for any reason, such as business, pleasure or curiosity, and in such manner as exposes them to danger of contact with it by accident or inadvertence, is bound to take precaution for their safety by insulation of the instrument used in its application or some other adequate means.   (p. 500).

4.  MASTER AND SERVANT—*Assumption of Risk.*

Ordinarily a servant assumes the risk of injury from the negli-gence of his fellow servant, but not from the negligence of the fellow servant augmented by that of the master. The negligence of the master contributing to that of the fellow servant or concurring with it relieves the injured servant from the operation of the fellow servantcy rule.   (p. 501).

Error to Circuit Court, Raleigh County.

Action by C. B. Humphreys against the Raleigh Coal & Coke Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*File & File*, for plaintiff in error.

*T. N. Read* and *A. A. Lilly*, for defendant in error.

POFFENBARGER, JUDGE:

On this writ of error to a judgment for $5,000.00 for injury to a hand of a track-layer in a coal mine by reason of contact with an uninsulated wire used as a feed wire to an electric pump operated in an unfrequented air course, the principal question is whether the duty as to the safety of the wire, as an appliance or instrumentality, rested upon the mine fore-man or the operator. If it was such as the law devolves upon the mine foreman, the negligence, if any, was that of a fellow servant, for which there can be no recovery from the em-ployer; but, if it was not, the fellow servantcy rule does not

apply and it becomes necessary to examine the action of the court upon the motions for relief from the verdict and the prayers for instructions refused and objections given, in the light of other legal principles.

The extensive mine in which the accident occurred, having several entries with parallel air courses between which break-throughs were made, was operated by electric power, supplied from a power house on the outside. Electric motors propelled from trolley wires over-head were used for hauling the bank cars and the mining machines and pumps were supplied with electric power from the trolley wires. The wire causing the injury complained of had been used to operate a heavy pump, mounted on a truck, at a low place in the mine at which water collected and, if not removed, spread through the entries and into the working rooms. The truck was so constructed as to run on the ordinary mine tracks, a branch from one of which had been built through an old break-through at the low place mentioned, a distance of about 35 feet, into the air course, and the pump run off on it to that point. From the trolley wire in the entry, the feed wire was carried along the rib of the break-through, near the top, on wooden pins, to the pump. It was insulated at each end for a distance of five or six feet by a "jumper", to enable persons handling it to hook one end of it over the trolley wire and attach the other to the pump, without coming in contact with the current, but was wholly uninsulated and exposed except at each end.

On February 1, 1911, heavy rains having fallen in consequence of which considerable water had collected and the pump having ceased to work properly, the mine foreman whose competence is not questioned, decided to remove the pump for repairs and to prevent submergence thereof. Intending to draw it out with the motor and believing some repairs to the track would have to be made to enable him to do so, he summoned the plaintiff, a track layer whose usual place of work was in the main entry, and his assistant, "to help get the pump out and fix the track up there where the pump was". They responded. In the meantime, however, finding the water too deep to permit the use of the motor for the purpose and having unavailingly endeavored to connect the motor to the pump by a chain of empty cars, one or more of which was left

on the track between the entry and the pump, the foreman adopted a new plan, removal by hand power, which seems to have been in process of execution when the plaintiff and his assistant arrived or very soon afterward. Johnson, the foreman, accompanied by four or five men, some of whom had been run in on the empty cars, while others had walked in on boards, was at the pump, and, deeming his force inadequate, sent the motor runner to the entry to call in the other two men, the plaintiff and his assistant, to aid in the work.. Obeying this summons, the plaintiff started in and, when he came to the car or train of cars, standing on the track, instead of passing around it on the boards, climbed over the top of it, and, on alighting or shortly after having alighted, slipped on a rail or some other object in the water, and, in falling or to prevent a fall, threw out his hand and caught the live wire, which had been detached from the pump but not from the trolley wire. As a result of the burn received from the contact, the last three fingers of plaintiff's right hand are badly crippled and the entire right arm has become practically useless.

Nothing in the statute imposing upon operators duty to employ mine foremen and exonerating them from liability for the consequences of the negligence of such employes acting within the scope of their statutory powers, absolves the employer from duty to equip the mine or plant with suitable machinery and appliances for the prosecution of the work. To the foreman, the statute commits the control and supervision of the inside workings or actual operation of the mine, including the use of machinery and appliances furnished by his employer. Much of this work is necessarily constructive in a sense, for the place of work is constantly changing. New entries are driven and old ones extended, with attendant air courses, tracks, refuge holes, rooms. supporting timbers and props and all that pertains to the extension of the work. For all this, the employer pays, and furnishes the labor, materials, machinery and appliances, but the mode and manner of execution of the work, including the operation of the fixed or stationary machinery for supplying air, removing water, expelling gas and the like, are committed to the mine foreman. Deeming his knowledge, judgment and skill superior to that of the employer, the legislature has placed the work of opera-

tion and provision for the safety of the miners in many respects within his exclusive jurisdiction. He must make the roof and haulways safe and keep them so, notwithstanding the common law would impose these duties upon his employer. But the employer is required in all instances to furnish the labor, materials, machinery and appliances. In no instance is the duty to provide means imposed upon the foreman. There are no doubt instances in which his judgment must control in the selection of materials, as in the case of timbers and props and perhaps appliances for removing water and controlling gas, but, in all such cases, his judgment rules in respect to matters expressly placed under his supervision and control. Moreover, in these cases, he merely prescribes what he deems necessary and his employer must supply it, if he would continue the operation of his mine with the conditional immunity the statute gives. These conclusions are in accord with the interpretation given the statute in *Squilache* v. *Coal & Coke Co.*, 64 W. Va. 337, saying the employer must make the mine "a reasonably safe place in the first instance", and *Peterson* v. *Collieries Co.*, 71 W. Va. 334, declaring liability upon the employer for injuries resulting from his failure to furnish materials properly demanded by the mine foreman.

Both the pump and the wire must necessarily have been furnished by the defendant, for obviously there was no duty upon any other person to supply them. If no feed wire was supplied and, in consequence of lack thereof, the foreman had to improvise the one used, it was none the less furnished by the defendant in the legal sense, for the mine foreman was his agent and what a man does through or by another he does himself. Manifestly the wire was an instrumentality or appliance for use, or at least used, in the operation of the pump. Provision of such things, suitable for the purposes for which they are used and reasonably safe as regards the person of the servant, is a non-delegable duty of the master imposed by the common law, from which he is not absolved by the terms or general purpose of the mine foreman statute. No ground is perceived upon which the duty in general as to this feed wire to a pump can be distinguished from that pertaining to the wiring of a motor, declared in *Mitchell* v. *Coal Co.*, 67 W. Va. 480, if the place and circumstances of its use

were such as to demand the exercise of prudence and care respecting the safety of servants.

The silent, latent, deadly, electrical power of a live wire, giving no warning of its presence through hearing, sight or other faculty renders it so highly dangerous that its use carries an extremely high degree of care. It is the concealment of its force inherent in its very nature that makes it so dangerous. Its presence is undiscoverable by any of the five senses other than that of feeling, and to discover by that is to place yourself within the deadly power of the thing itself and suffer the injury, for there is a seizure in the very instant of contact. Therefore to use it at all by means of an uninsulated wire or other appliance where the user knows any person may for any reason come in contact with it, without knowledge of the use to which the appliance is devoted, is tantamount to the placing of a deadly mine or trap, however free the user may be from wrongful intent. *Runyan* v. *Water & Light Co.*, 68 W. Va. 609; *Thornburg* v. *Railroad Co.*, 65 W. Va. 379; *Bice* v. *Electrical Co.*, 62 W. Va. 685; *Thomas* v. *Electrical Co.*, 54 W. Va. 395; *Snyder* v. *Electrical Co.*, 43 W. Va. 661.

The break-through and air course in which the bare part of the wire in question was used were not passage ways nor places of ordinary work. Nevertheless, there was occasion to enter them, when they were adopted as proper locations for the pump and feed wire. There was a "pump runner" whose duty it was, entering by the break-through and air course through which the wire ran, to visit the pump and keep it in operation when necessary, and it was also necessary for somebody to place the pump in that place and remove it. Any of these persons stumbling, slipping or falling, or inadvertently throwing out a hand or veering to the wall on which the wire was strung, were liable to come into contact with it and suffer consequent injury. Authorities cited abundantly show the user of electricity must provide against all probable contingencies and every possibility that can be readily forseen or anticipated. If he knows any person is liable, in any way or for any reason, whether on a mission or enterprise of business or pleasure, to come in contact with a heavily charged electric wire he is using, he must insulate it, unless insulation is

impossible by reason of incompatibility with the use to which it is devoted. In view of this principle, it is wholly immaterial that the place in which the wire was used was not a way of passage or place of ordinary work. The defendant should have had the wire insulated.

Whether the mine foreman and the plaintiff were by the common law fellow servants, as is argued, is immaterial. As the use of the uninsulated wire under the circumstances disclosed was a negligent act on the part of the defendant, part and parcel of the cause of the injury, the negligent failure of the foreman to disconnect the wire from the trolley had in it the element of contribution or concurrence on the part of the defendant. In other words, the negligence of the foreman, though nearest the injury in point of time, was not the sole cause. Ordinarily a servant assumes the risk of injury by the negligence of the fellow servant, but not the negligence of the servant plus that of the master, whether the latter be contributory or concurrent. *Lay, Admr.,* v. *Coal & Coke Co.,* 64 W. Va. 288; 12 A. & E. Enc. L. 905; 26 Cyc. 1302.

These principles and conclusions demonstrate to a certainty the propriety of the action of the trial court in refusing to direct a verdict for the defendant by a peremptory instruction or otherwise and in its refusal to set aside the verdict or arrest the judgment on the ground of insufficiency of the evidence. The negligence of the defendant is fully established, there is no room for defense under the fellow servantcy rule, and there is no evidence of contributory negligence. The plaintiff had no knowledge of the condition of the wire and had never before been in the break-through or the entry from which it led. Though he had seen an electric pump in another entry, there is neither an admission nor proof of his knowledge of lack of insulation of the wire used with it. If this circumstance could be regarded as evidence of knowledge of the condition of the wire by which he was hurt, it is certainly not conclusive and the question of contributory negligence or assumption of risk was, to say the least, one for the jury.

Plaintiff's instruction No. 1, declaring the duty of the defendant to provide for the plaintiff a reasonably safe place of work and submitting hypothetically the question of negligence upon the salient facts to which reference has been

made, was resisted upon two grounds, (a) seclusion of the place in which the wire was used, it being one of neither work nor passage or travel, and (b) lack of occasion, in the exercise of care, for insulation, since the opening was of considerable width and the wire was carried along the wall.

What has been said respecting the subject matter of the first of the grounds suffices. Though there was room enough to pass without touching the wire, it was nevertheless dangerous. The roof of the mine was low, only four or five feet from the floor, wherefore the wire was within easy reach and liable to be touched in case of accident or inadvertant action. Instructions Nos. 4 and 5 were substantially the same as No. 1.

The objection to plaintiff's instruction No. 2, affirming the duty of the defendant to insulate electric wires at places at which workmen were reasonably likely to come into contact with them, is the failure to except the trolley wires which could not be insulated. As the issue related solely to the pump wire, this inaccuracy of statement cannot be deemed to have mislead the jury. The error was, therefore, not prejudicial.

Plaintiff's instruction No. 3 correctly applies the doctrine *res ipsa loquitur*. In giving it, the court did not err. See cases cited.

Instruction No. 6 affirmed the right of the plaintiff to presume the insulation of the wire in the absence of knowledge of its actual condition, and was obviously good.

All the instructions asked for by the defendant were given. Some of them were more favorable to it than it was entitled to have. Of course the finding of the jury was contrary to those so erroneously given, but that constituted no ground for a new trial.

The judgment is free from prejudicial error and will be affirmed.

*Affirmed.*