# CHARLESTON

## JAGGIE, ADM'R. v. DAVIS COLLIERY CO.

Submitted November 24, 1914.     Decided December 22, 1914.

1. MASTER AND SERVANT—*Duty of Mine Operator—Safe Appliances.*
    It is the duty of a mine operator to maintain his motor and motor tracks in a reasonably safe and suitable condition for the safety of his servants employed to operate the same.   Sec. 24, Ch. 15H, Code 1913, does not impose upon the mine foreman the duty to see that either the motor or tracks in the mine are properly maintained and, consequently, the master is not relieved from his common law duty in respect thereto.   (p. 372).

2. SAME—*"Safe Appliances"—Motor Tracks.*
    Motor tracks, although constituting a permanent part of the mine, are, nevertheless, appliances for the removal of coal therefrom.   (p. 372).

3.  SAME—*Injury to Mine Employe—Failure to Print and Post Rule—*
    *Liability of Operator.*
    Sec. 34, Ch. 15H, Code 1913, requires a mine operator to adopt,
    print and post rules for the government and operation of his mine,
    which shall embrace ''all the work pertaining thereto, in and out-
    side of the same,'' and for the failure to print and post a rule
    regulating the number of cars that may be hauled by a motor,
    proximately resulting in injury to one of his servants, he is liable.
    (p. 375).

4.  WITNESSES—*Contradictory Statements—Admissibility.*
    Contradictory statements by a witness, as to material facts, are
    admissible in rebuttal for the purpose of weakening or destroying
    the value of his testimony, provided the foundation therefor has been
    laid by proper cross-examination, but are not admissible as primary
    evidence of the controverted fact.  (p. 376).

5.  MASTER AND SERVANT—*Death of Mine Employe—Evidence—Report*
    *of Inspector.*
    The report of a district mine inspector, respecting the condition
    of the interior of a coal mine, is not evidence in the trial of an action
    for the wrongful death of an employe in the mine, caused by the
    alleged negligence of the mine operator.  (p. 377).

6.  NEGLIGENCE—*Evidence—Conflicting Evidence—Question for Jury.*
    Negligence is a question for the jury when it depends upon the
    existence of certain facts respecting which the testimony is conflict-
    ing.  (p. 377).

7.  TRIAL—*Weight of Evidence—Question for Jury.*
    The jury are the sole judges of the weight and value of conflicting
    testimony of witnesses.  (p. 377).

Error to Circuit Court, Randolph County.

Action by Benjamin J. Jaggie, administrator, etc., against
the Davis Colliery Company.  Judgment for plaintiff, and
defendant brings error.

*Affirmed.*

*E. A. Bowers,* for plaintiff in error.

*H. G. Kump,* for defendant in error.

WILLIAMS, JUDGE:

Plaintiff's intestate, who was his son, was employed as
motorman in defendant's coal mine, and, as he was bringing
a train of loaded cars out of the mine, the motor was derailed
and ran against the props at the side of the haulway sup-

porting the roof, knocking some of them down and causing loose rock and slate overhead to fall on him and kill him. Plaintiff recovered a judgment for $6,000.00 for his alleged wrongful death, and defendant was awarded this writ of error. The declaration contains eleven counts. A demurrer was interposed to it and to each separate count. The court sustained the demurrer to the third, fourth, seventh, eighth and ninth counts, and overruled it as to all the others. A number of errors are assigned. We will first consider the one relating to the overruling of the demurrer to the six remaining counts.

The first count, briefly stated, avers that it was defendant's duty to maintain a reasonably safe and suitable motor track in its mine; that it failed to perform its duty in this respect; that the track was defective, uneven and unsafe, and by reason thereof plaintiff's intestate was killed while engaged in the regular performance of services for defendant. The overruling of the demurrer to this count presents the legal question, whether it was defendant's duty to maintain a reasonably safe and suitable track in its mine. Such was unquestionably the master's duty at the common law; it was one of the primary duties a master owed to his servant to furnish him a place and appliances, reasonably safe, in and with which to work. Motor tracks in the main haulway of a coal mine partake of the nature of both a place and an appliance. They are permanently laid in the mine and, therefore, a part of the place; and they are essential to the operation of the motor and, hence, an appliance for the removal of coal. "An appliance is anything brought into use as a means to effect some end." *Honaker* v. *Board of Education,* 42 W. Va. 174. Machinery, apparatus and premises, *Collins* v. *Harrison,* 25 R. I. 489, 56 Atl. 678; a gate on the side of the platform of a street car, *Stappers* v. *Interurban St. Ry. Co.,* 106 N. Y. Sup. 854; Scaffolding for workmen, *Phoenix Bridge Co.* v. *Castleberry,* 131 Fed. 175; skids laid over a trench on which iron pipes are placed, to rest there until lowered into a trench, *Tamaseric* v. *Beckwith,* 129 N. Y. Sup. 361, have all been held to be appliances. "Appliances of transportation" include the road bed, tracks, cars and engines. *Burns* v. *Penna. R. R. Co.,* 233 Pa. 304. 82 Atl. 246.

But the principal question with which we are confronted in this case is, does the statute requiring a mine operator to employ a mine foreman, and prescribing the mine foreman's duties, relieve the operator from his common law duty to maintain a reasonably safe and suitable track, after he has employed a mine foreman? It is settled by previous ·decisions that sec. 24, ch. 15H, serial sec. 483, Code 1913, defining the mine foreman's duties, discharges the master from liability to his servant for injury resulting from failure·. to do any of those things which are enjoined upon the mine foreman, provided the mine owner or operator has used reasonable diligence to procure a suitable mine foreman. If he has done his duty in this respect, the mine foreman is then held to occupy the relation of fellow-servant, and not of vice-principal or agent of the master, to every other employee in the mine, in respect to those things expressly given in his charge by the statute. *Williams* v. *Thacker Coal & Coke Co.*, 44 W. Va. 599; *McMillan* v. *Coal Co.*, 61 W. Va. 531; *Squilache* v. *Coal & Coke Co.*, 64 W. Va. 337; *Bralley* v. *Coal & Coke Co.*, 66 W. Va. 278; *Peterson* v. *Paint Creek Collieries Co.*, 71 W. Va. 334; and *Hellicl* v. *Piney Coal & Coke Co.*, 70 W. Va. 45. The statute says the mine foreman shall "keep a careful watch over the ventilating apparatus and the airways, traveling ways, pumps and drainage." This direction is general. In other parts of the section his duties with respect to these things are specifically set forth. Respecting the traveling ways and ventilation, he is required to see that proper break-throughs are made or that brattice is used; that no loose coal, slate or rock is hanging overhead or along the haulways; that sufficient props, caps and timbers are furnished to the miners in their respective places of work; that the water is drained out of the working places and they are kept dry, as near as practicable, while the miners are at work; that recesses are made not less than one hundred feet apart along the haulways, between the wagon and the ribs, for a refuge place for the men; and, on all haulways, where hauling is done by machinery of any kind, he is required to provide a proper system of signals and a conspicuous light, and to see that such conspicuous light is carried on the front and rear of every trip of cars when in motion in a mine. A num-

ber of other duties of the mine foreman are specifically named in the statute. But nowhere in it is he expressly given supervision of the motor tracks and required to see that they are maintained in a safe and suitable condition; nor de we think it can be fairly implied from the language of the statute that the legislature meant to impose that particular duty upon the mine foreman. To lay a track properly requires engineering skill, skill that a mine foreman, possessing all the requisites prescribed by the statute for his qualification as a mine boss, is not presumed to have. By defining the mine foreman's duties with such great particularity and omitting to mention the supervision of the motor tracks as one of them, although it is evident the legislature had in mind the removal of coal by electric motors, for it required the foreman to provide a system of lights and signals on haulways where hauling was done by machinery, evinces a clear legislative purpose not to include the care of the tracks as a part of his duties. Supervision of the tracks is not a duty to be implied; it is not essential to the complete performance of any of the acts expressly required of the mine foreman. By the common law the servant was given a right of action for neglect of duty proximately causing him injury, and by statute his personal representative is given such right of action in case of his death by such neglect of duty, and such rights can be taken away only when the intention of the legislature to do so clearly appears by the express language of the statute or by necessary implication. The statute, being in derogation of a common law right, is subject to the rules of strict interpretation. In *Mitchell* v. *United States Coal & Coke Co.*, 67 W. Va. 480, we held it was the master's duty to see that the insulator on the motor, protecting the wire that connected with the trolley, was kept in proper condition. In *Humphreys* v. *Raleigh Coal & Coke Co.*, 73 W. Va. 495, 80 S. E. 803, we held that the mine-foreman statute did not relieve the mine operator from "his common-law duty to exercise reasonable care to provide reasonably safe machinery, tools, and appliances for use in the mine, and make the mine a reasonably safe place for work, except in so far as the duty is devolved upon the mine foreman." In *Cheeks* v. *Virginia-Pocahontas Coal Co.*, 74 W. Va.

553, 82 S. E. 756, we held the statute did not exonerate the mine owner or operator from his duty to exercise reasonable care "to provide safe and suitable appliances, like a motor, for use in the mine." And in *Crockett, Adm'r.* v. *Black Wolf Coal & Coke Co.,* 75 W. Va. 325, decided at the present term, we held that the mine owner or operator is not relieved from his common law duty to see that the trolley wire in a coal mine is maintained in a reasonably safe condition. The tracks are just as essential to the successful operation of an electric motor as the trolley wire, both are appliances used in the mines for the removal of the coal, and it is the imperative duty of the master to see that all those things, the tracks, trolley wire and motor, are maintained in a reasonably safe condition. The demurrer to the first count was, therefore, properly overruled.

For the reason already given it was likewise proper to overrule the demurrer to the second count, which avers that defendant furnished a motor with defective, imperfect and broken wheels which proximately caused the death of plaintiff's intestate. But we may properly say here and now that there is no evidence to support this count.

The fifth, sixth, tenth and eleventh counts will be considered together. The fifth count avers that the defendant negligently and carelessly overloaded the motor, that its capacity was limited to nineteen loaded cars, and that defendant negligently caused twenty-five loaded cars to be attached to it, thereby causing its derailment resulting in the death of plaintiff's intestate. The sixth count charges negligence in two particulars, (1) overloading the motor, and (2) in overcharging the trolly wire with electricity, which negligent acts combined caused the derailment and the death of plaintiff's intestate. There is no evidence to support the averment of an overcharge of electric current. But the demurrer to the two counts last mentioned was properly overruled, as they averred negligent overloading by defendant. It can not be inferred from the allegations that it was done by a fellow servant of deceased. Whether or not it was by a fellow servant depended on the evidence.

The tenth count charges negligence in failing to adopt and print rules prescribing the number of carloads to be hauled

on a trip, and that on account of its neglect of duty in this respect the motor was overloaded, causing its derailment. The eleventh count avers that the defendant did prescribe special rules pertaining to the work carried on inside and outside of the mine, and in one of said rules prescribed that not more than nineteen loaded cars should be hauled by a motor on one trip, but that it disregarded its said rule and negligently and carelessly overloaded the motor causing its derailment and the death of intestate. The validity of counts ten and eleven depends upon the duty of a mine owner or operator respecting the making and publishing of rules for the safety and security of the miners. Sec. 34, ch. 15H, serial sec. 493, Code 1913, requires every mine operator to adopt "special rules for the government and operation of his mine or mines, covering all the work pertaining thereto in and outside of the same, which however, shall not be in conflict with the provisions of the mining laws of this state." Such rules are required to be published in all the languages spoken by at least ten of his employes, and posted in certain designated places about the mine; and the operator is also required to furnish each employe a copy of the printed rules when requested. Does the statute contemplate the making of a rule regulating the operation of motors and limiting the maximum number of loaded cars that they may haul? We think it does. Its terms are very broad and comprehensive. The rules are expressly intended for the government and operation of the mine, and the statute says they shall embrace "all the work pertaining thereto, in and outside of the same." Hence, a rule prescribing the maximum number of cars to be hauled by a motor would seem to be included, as it pertains to the operation of the mine. There is more danger in operating a long train than a short one, and a rule on the subject would seem to be a reasonable requirement. The tenth and eleventh counts were, therefore, good, and the demurrer thereto properly overruled.

We will next consider the assignment relating to the action of the court in permitting William Scott, witness for plaintiff, to testify respecting an alleged declaration, made sometime after the accident concerning the cause thereof, by mine foreman Condry, one of defendant's witnesses. Scott's testi-

mony was rebuttal evidence and was for the purpose of contradicting Condry. The foundation therefor had been laid in the cross-examination of Condry. In his examination in chief Condry had testified as to the cause of the derailment, and on cross-examination he was asked if he had not told witness Scott, shortly after the accident, that it was caused by a bad joint, and denied making the statement. The fact was material to the issue, and Scott was permitted to testify that he did tell him it was caused by a bad joint in the rail. The evidence was clearly admissible for the purpose of contradiction. It was not offered as evidence in chief, and of course would not be admissible as such.

The court refused to permit the defendant to introduce, as evidence, the report of the District Mine Inspector, for the purpose of proving the condition of the mine. There was clearly no error in that. The district mine inspector's report was not proper evidence on the trial of the cause. Moreover, if admitted, it would only have been self-serving to the witness, for he was there in person and testified as to what he knew about the condition of the mine when he examined it, which was some days after the accident.

The fourth and fifth assignments relate to the giving of certain instructions for plaintiff and the refusal to give certain others asked for by defendant. But before taking them up we will consider the question of the sufficiency of plaintiff's evidence, falling under the sixth, and last, assignment of error relating to the overruling of defendant's motion to set aside the verdict. The evidence is very conflicting as to what caused the derailment of the motor. There was a joint in one of the rails at, or near, the place where it left the track, made by the union of a fifty-six pound rail with a thirty-five pound rail; and the conflict is on the question whether it left the track immediately at the joint, and because the joint was not in proper condition, or at a point about the middle of the fifty-six pound rail, where it is proven the track was in proper alignment and in good condition. The motor was going out of the mine with a train of twenty-five loaded cars, over a straight track and on a down grade of 1.65 per centum until within about fifty or sixty feet of where the wrecked motor was found, and from there on to

where the motor lay it was level. The testimony of defendant's witnesses tends to prove that it left the track near the middle of the rail, and before reaching the joint; that at that point, thirty feet back of where the motor lay, a scar was visible on the face of the rail, as if made by the flange of a car wheel in passing diagonally over it, which defendant's witnesses say they did not think could have been made by the flange of a wheel of a coal car, which weighs, when loaded, only about three tons, whereas the motor weighed fourteen tons. Some of the witnesses also say there were marks on the cross ties made by the flanges of the motor wheels, several feet back of the joint in the rail. On the other hand, a number of plaintiff's witnesses testified to certain facts which, if the jury believed to be true, compelled them to find that the motor left the track, not near the middle of the rail, but where the two rails joined, and that it did so because of a defective joint. Cooper Lantz, a motorman in the same mine, who helped to clear up the wreck, says the rails were not in line at the joint, that "one rail stuck out a little in front of the other, and the flange of the motor struck on that rail." He further says the marks on the crossties, made by the motor car, did not appear back of the joint. William Berkley, a brakeman, testified that the joint was bad before the wreck, that the motor would jump as it went over it. He says that, on the Monday after the wreck, he examined the joint, and stepped on the end of the rail and his weight caused it to sink down more than an inch below the end of the other one; and that there was a small groove on the end of the rail that looked like a wheel had struck it. He also says there were no marks of the motor wheels on the crossties back of the joint. Sanford Taylor, who was also a motorman in the same mine, says the joint was bad; that when the motor passed over it it would give down. Benjamin Jaggie, the plaintiff, worked in the mine, was sometimes roadman, but did not lay the rails in question. He says he was at the place before the wreck was cleared up, and examined the tracks to see if he could find out what caused it, and saw that the small rail stood out from the large one. He says the flange of the motor struck the small rail, that "a mark was there on the end of the rail." He further says there were marks on the crossties made by

the wheels of the motor between the joint and the place where
the motor stopped. All the witnesses agree that the motor
stopped six or eight feet forward of the joint in the rail, and
the evidence tends to prove that at the time it was wrecked
it was moving at the rate of about six miles an hour. The
jury could well believe from plaintiff's evidence that the joint
between the rails was in bad condition and that that caused
the wreck. In view of the straight track, the down grade, the
slow rate of speed at which the motor was moving and the
proper gauge and good condition of the tracks back of the
joint, plaintiff's theory as to the cause of the wreck and the
place where it occurred is much more plausible than the
theory of defendant. On the other hand, there is abundance
of testimony tending to prove that the motor left the track
about the middle of the rail and before reaching the joint.
But some of defendant's witnesses testify that they examined
the tracks at that point, as soon as the wreck was cleared up,
and found them in good alignment and in proper gauge. So
that if the motor did in fact jump the track where defendant
contends it did, it would be difficult to discover the cause.
There is no evidence tending to prove that the motor, or any
of its parts, were out of repair or defective, or that defendant
negligently overcharged the wire and thereby caused the
wreck. There was some evidence tending to prove that it
might have been caused by overloading the motor. But still,
if that was the cause, the defendant was liable, it having been
proven, and not denied, that its printed rules were silent
respecting the maximum number of loaded cars to be attached
to a motor. There was no rule on that subject. There is evi-
dence tending to prove that the train, at first, consisted of
twenty-one cars of coal, and that four cars of slate were later
attached to it by order of the mine foreman or his assistant,
and it is argued that, if his act was the negligence that caused
the wreck, it was the negligence of a fellow servant. But
that is not correct, in view of the fact that the wreck would be
properly attributable to the want of a proper rule on the sub-
ject as the proximate cause. The making of rules is a non-
delegable duty of the master. The operator could not leave
that duty to the mine foreman and then escape liability if
it is not performed. The jury had a right to weigh the

reasonableness of the respective theories, in connection with the conflicting testimony of witnesses in respect thereto, and determine the controverted fact according to their belief derived from all the evidence. It was also their duty to determine whether defendant had used proper diligence to keep its tracks in a reasonably safe condition. In view of the controverted facts the question of negligence was one for jury determination. There is sufficient evidence to support the verdict and the court did not err in refusing to set it aside on the ground that it was contrary to the evidence, or that it was against the great weight of evidence. Although a greater number of witnesses for defendant were examined to prove its theory than were examined by plaintiff to prove his, still the weight of evidence does not depend upon mere numbers of witnesses. Where the testimony is in conflict it is the special province of the jury to say which ones are telling the truth and which ones are not, and the court has no right to invade their province and say their judgment with respect thereto is wrong.

We have read and carefully considered the instructions, as well those given for plaintiff over the objection of defendant as those asked for by defendant and refused, and do not think the court committed any error in the matter of giving or refusing instructions. It suffices to say that the instructions fairly gave to the jury the law of the case as we have declared it to be in the foregoing opinion. A discussion of the instructions, seriatim, would be only a repetition, in another form, of what we have already decided is the law applicable to the case.

The judgment is affirmed.

*Affirmed.*