STATE OF WEST VIRGINIA

*v.*

JOHN RICHARD SPADAFORE

(No. 13503)

Decided December 16, 1975.

*Paul E. Parker, Jr.,* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Betty Caplan, Fredric J. George,* Assistant Attorneys General, *for defendant in error.*

NEELY, JUSTICE:

This is a factually complicated criminal case in which the defendant was convicted of stealing a bulldozer from a construction site. There are numerous assignments of error which are relevant only upon the retrial of this case and with which the Court will deal *seriatim* in the footnotes; however, there are two significant assignments of error which warrant reversal and which are of general importance to the development of the criminal law of this State.

The first general question presented concerns the degree to which a witness's prior out-of-court statement may be used as substantive evidence to prove the truth of the matter asserted in the out-of-court statement, and the second general question presented concerns whether the State is entitled to a cautionary instruction that the evidence of a possible co-conspirator which would tend to *exonerate* the defendant should be received with great caution, in the same manner that the defendant is entitled to a similar instruction in the case of a co-conspirator whose uncorroborated evidence would tend to *inculpate* the defendant.

In 1968, Clement Brothers Construction Company was building part of Interstate 79 in Marion County and at the conclusion of the working day on Friday, September 6, 1968 several pieces of heavy equipment were left on the construction site. On Monday morning, September 9, a 977-K Caterpillar end-loader or Traxcavator was missing. The machine was reported as stolen, and later that day the police found the bulldozer in the possession of Frank Chisler, a Monongalia County contractor. Chisler told the police that he had sent two of his men with a lowboy trailer to pick up the machine at the request of two men who had offered to sell it to him. Chisler then identified the defendant from photographs exhibited to him by the police.[1] The police then gave Chisler $15,000.00 in marked currency and instructed him to complete the transaction.

On September 11, the defendant, John Richard Spadafore, and his brother, Donald Spadafore, arrived at Chisler's office in Daybrook, Monongalia County. When they left the office, they were met by police who arrested them and searched their persons. The police seized a purported bill of sale and a bag containing the marked currency.[2]

---

[1]The defendant alleges that the photographs were improperly suggestive in that the evidence discloses that Chisler was shown several photographs of varying sizes and four 8 × 10 inch photographs, three of which were of the defendant and his brother. However, Chisler's testimony reveals that he met with the defendant on at least two occasions prior to the photographic identification. At one of those meetings, Chisler testified that he got a good look at the defendant. Consequently, we consider the allegation of suggestive identification to be without sufficient merit to warrant further discussion in this opinion.

[2]The defendant alleges that the warrant for his arrest was issued without probable cause and, therefore, the arrest and concomitant search were illegal. The evidence clearly demonstrates that there was probable cause for the warrant; but even if the warrant were improvidently issued, the record shows that the arresting officer had sufficient independent knowledge of the facts to make the arrest. The testimony discloses that the Sheriff's office began an investigation upon hearing that the bulldozer had been stolen; the

The Spadafore brothers were taken into custody, booked, and released on bond. The two brothers were ordered to be tried separately, and in May 1972, a jury found the defendant's brother not guilty. The defendant was tried in November 1972, upon a plea of not guilty, but was convicted of grand larceny and this appeal was prosecuted from the final order of the circuit court affirming the criminal court conviction.

At trial the State easily established the ownership, title and value of the bulldozer, that it was on the construction site on September 6, 1968, and absent from that site on September 9. The circumstances at trial which raised the first principal assignment of error concerning the use of an out-of-court statement to establish the truth of the matter asserted in that statement arose during direct examination of a witness named John Boyce. Boyce was in the scrap and salvage business and had been indicted as an accessory before the fact to the taking of the bulldozer, but the indictments against him had been dismissed for failure of the State to prosecute within three terms of court.

Boyce testified that he had discussed the sale of certain bankrupt property, including heavy machinery, with Frank Chisler; however, Boyce denied that he had related Chisler's interest in buying a bulldozer to the

---

bulldozer was found on Frank Chisler's property; Chisler gave a statement to police concerning how the bulldozer came to be on his property; Chisler identified the defendant and his brother from police photographs as the men who had offered to sell the bulldozer to him; Chisler arranged for the defendant to come to his place and complete the transaction; and, the defendant and his brother arrived at the time and place that had been arranged. Even though the arresting officer had not participated in the entire investigation, he knew of the stolen bulldozer and had been informed by the investigating officers that the two men suspected of the theft would be at Chisler's at the pre-arranged time to sell the machinery to Chisler. Therefore, any allegation as to the illegality of a warrantless search lacks merit, as the arresting officer had sufficient independent knowledge of the facts to make the arrest irrespective of the validity of the warrant as he had reasonable grounds to believe that a felony, namely the sale of stolen properly, was being committed in his presence.

defendant or his brother. A statement Boyce had given to the police on September 11, 1968, provided differently, however, and at trial the State claimed surprise and was allowed to impeach Boyce using much of the substance of the prior statement to discredit Boyce's lack of memory. At no time did Boyce testify to a set of facts which was contrary to his prior out-of-court statement, but he consistently asserted a lack of memory which resulted in his not testifying at all concerning the transactions which were necessary for the State to prove its case.

The next State's witness, James Barr, had been an employee of Frank Chisler during September 1968. Barr testified that Chisler had directed him to haul a bulldozer after dark on September 4, 1968 and that he and another employee, Joe Postlewait, drove Chisler's lowboy trailer to Boyce's house where they were to meet two unidentified men. Barr and Postlewait drank coffee with Boyce and his wife until the two men arrived about an hour later; however, for some unexplained reason they did not pick up the bulldozer that night.

According to Barr, Chisler called him again several days later and instructed him to pick up the machinery with another employee, Loren Bane. Barr and Bane drove the lowboy trailer to Boyce's place again where they met one of the men Barr had seen at Boyce's on the first evening. They then drove to the Country Inn in Fairmont and waited twenty minutes until the arrival of the same two men whom Barr had met the previous night at Boyce's. A third unidentified man whom Barr had not seen before accompanied them. All of them then went to the construction site where Bane and Barr loaded the bulldozer onto the trailer while two of the other men stayed in the car and the third man walked around as a lookout using a walkie-talkie. Barr and Bane were instructed to drive the machinery through Monongalia County to a hollow behind Frank Chisler's garage for which they were each paid $50.00. The machinery was delivered as instructed and Barr testified that he never saw the two men after that night, except at the jail.

Larry Strowsnyder, another employee of Frank Chisler, was the next witness for the State who testified that on September 7, 1968, he was at Frank Chisler's garage, and that he went to Blacksville for coffee with a man waiting to see Chisler. Strowsnyder was also present at Chisler's when the defendant and his brother were arrested and he thought that one of the two men arrested had accompanied him to Blacksville for coffee.

Frank Chisler was then called to the stand for the State. He said that he was asked by John Boyce in late August 1968 if he would be interested in buying a bulldozer. Several days later, Chisler said the defendant came to his home. Chisler then identified the defendant in court as the man who had come to his home and further testified that several days later the defendant and his brother came to his office, whereupon Barr took the lowboy trailer and returned with the bulldozer. On Monday, September 9, Chisler testified that a deputy came to his office and asked that Chisler call the Marion County Sheriff's office about the machinery. Later that day the Sheriff himself arrived at Chisler's to view the bulldozer and Chisler told the police at that time that the defendant had discussed a price of $15,000.00 in cash. Chisler went to the office of the Sheriff of Marion County where he identified the defendant from a group of photographs tendered to him. The police then gave him the $15,000.00 in marked currency and instructed him to return to his office and complete the transaction. The Spadafore brothers came as arranged, accepted the money, and gave a purported bill of sale. As the defendant and his brother left the office they were met by police and were arrested with the money in hand.

Chief Deputy Dodd testified that he had participated in the arrest and that he had seized a purported bill of sale in the course of the search incident to the arrest. Dodd testified that Chisler had identified the defendant and his brother as "the two men he had dealt with on this end-loader."[3]

---

[3]The defendant assigns as error that the evidence in support of his conviction for grand larceny is insufficient as a matter of law in

After the State rested, the defense put on the defendant's wife and mother-in-law for alibi testimony, and then called Loren Bane to the stand. Bane admitted that he and Barr had followed two men to the construction site at Chisler's direction where they drove the bulldozer onto the lowboy and then drove it back to Chisler's garage. Bane testified that the defendant was not "any one of the men that accompanied him" on the night he went to the construction site to load the machine and take it to Chisler's. Bane denied that he had made a statement to the police on September 11, 1968, but when shown a police statement in the handwriting of an officer, Bane said that he was under tremendous pressure and that he was afraid at the time of being implicated in the offense. The statement said: "I never did hear either of these two men's names but the two men I saw at the Marion County jail this afternoon are definitely the two men that was with us when we got the end-loader."

It is with regard to the exculpating testimony of Bane that the question arises concerning a cautionary instruction given by the trial court that if the jury believed that Loren Bane knew or had reason to know that the owner of the machinery allegedly stolen had not consented to its removal, from all the circumstances in the case, Bane might not be considered an innocent agent but considered an accomplice and his testimony received with great caution.

---

that the State failed to prove an essential element of larceny—namely, that the defendant was present at the time and place of the asportation. While there is no concrete, direct evidence of this element, the law provides for convictions based solely on circumstantial evidence. The evidence discloses that the defendant negotiated the sale prior to the asportation and that he came to pick up money to complete the sale after the asportation. When added to the inconsistencies in the testimony of two witnesses as to the defendant's presence at the site of the theft, the circumstantial evidence is sufficient to conclude that the defendant participated in the actual theft. Therefore, the conviction was justifiable and this assignment of error also lacks merit.

Upon the testimony and evidence summarized above, the jury found the defendant guilty of grand larceny as charged.[4]

## I

The first major issue to be decided in this case is to what extent the trial court may permit the State to introduce into evidence and submit to the jury, under the guise of impeachment, incriminating matters contained in an unsworn out-of-court statement made before trial.

The witness, John Boyce, in response to leading questions, stated that he did not remember the defendant and his brother offering a bulldozer for sale in August or September of 1968. Boyce testified that he knew that Frank Chisler was engaged in the pipeline business, in which he used heavy equipment, and that he had discussed with Chisler about the time in question the sale of certain bankrupt property, including heavy equipment. Although Boyce admitted that Frank Chisler was interested in buying a bulldozer, Boyce testified that he did not tell the defendant or his brother.

---

[4]The defendant also assigns as error the circuit court's action in 1) denying defendant's motions for a directed verdict and a new trial; 2) permitting a state policeman to testify that he compared serial numbers on the currency seized from the defendant with the numbers on a list prepared by another officer and further testifying that he found that the numbers matched; 3) failing to conduct an out-of-court hearing on the issue of photographic suggestion of the defendant's identity; 4) participating in the State's case without notice to or knowledge of the defendant and without his consent; 5) giving a State's instruction which told the jurors that "beyond all reasonable doubt" does not mean "beyond all possible doubt" and that "what jurors believe as men they should believe as jurors;" 6) giving seven State's instructions attempting to define reasonable doubt in a way favorable to the State, all over defendant's objections; and 7) the cumulative effect of numerous errors which prejudiced the defendant and prevented him from receiving a fair trial. After full consideration by this Court, we find these alleged errors to be without merit and not fairly raised.

However, on September 11, 1968, Boyce made a statement to the state police and at trial he was handed a photocopy of that statement. When Boyce declined to testify with regard to certain matters on the grounds that he allegedly did not remember, the prosecutor declared the witness hostile and proceeded to impeach him using his statement of September 11 by making twenty-six inquiries, all of which incriminated the defendant, and to each of which the witness responded that he did not remember. At one point in the record he said:

> "I don't remember saying that that night. I was confused, upset and threatened to be put in jail and everything else, and I don't remember what I said. It was something I didn't have anything to do with."

One of the incriminating parts from the out-of-court statement was as follows:

> "Approximately two weeks ago, John Richard and Donald Spadafore came to my place of business known as Big John's Salvage between Fairmont and Farmington, West Virginia, on U.S. Route 250, and they asked me if I wanted to buy a bulldozer and I told them that I had no use for it."

The prosecutor then asked, "Now, isn't that your statement?"

The matters that went to the jury under the guise of impeachment included accusations that the defendant and his brother came to Boyce's business wanting to sell a bulldozer; that Boyce talked with Chisler and told the defendant and his brother that Chisler was interested in buying a bulldozer; that Chisler had said it was quite a bargain; that the defendant and his brother had gotten the bulldozer by repossession or an insurance deal; that the defendant and his brother could not keep a particular appointment with Chisler and asked the witness to so inform Chisler; that the witness so told Chisler at a parking lot in Fairmont; that later one of Chisler's trail-

ers came to Boyce's place of business and two of his employees said they were to meet the Spadafore brothers at the witness's place; that the defendant and his brother came to the place, met the employees and left with them; that later the witness drove the defendant to see Chisler; that defendant and Chisler talked on that occasion; that defendant and his brother came to Boyce's place on September 10, saying that Chisler was to call and meet the brothers at Boyce's place; that Chisler called and talked with one of the brothers; that one of the brothers told the witness that they were to meet Chisler on September 11; that he guessed it was about the bulldozer; that the witness asked the brothers if they had read the newspaper about the bulldozer being missing from the job site to which they said they had a bill of sale and exhibited a bill of sale to the witness; and, that the brothers exhibited a paper, with Clement Brothers' printed letterhead, describing a piece of machinery.

## A

The issue of admissibility of prior statements to prove the truth of the matter asserted is well developed in West Virginia, and substantial light is further shed on the problem by inquiry into the law of foreign jurisdictions. The issue involves three historical rules of law, their exceptions and recent judicial interpretations of those rules. The historical rules involved are the rule against impeaching one's own witness, the use of prior inconsistent statements of a witness to impeach his present testimony at trial, and the hearsay rule.

Generally, after a proper foundation has been laid, a witness may be impeached by evidence of his declarations or statements which are either inconsistent or contradictory to his testimony at trial. The fact that he has stated the matters differently on a previous occasion tends to demonstrate either a failure of memory, or a lack of integrity, and in either event it weakens and impairs the value of his testimony. A witness who surprises the side which calls him by being hostile may be

impeached by the equivalent of cross-examination. *State v. Koch,* 75 W. Va. 648, 84 S.E. 510 (1915); *State v. Carduff,* 142 W. Va. 18, 93 S.E.2d 502 (1956); *State v. Johnson,* 142 W. Va. 284, 95 S.E.2d 409 (1956).

The orthodox rule with regard to prior inconsistent statements is that such statements cannot be accorded any value as substantive evidence. The reasoning which justifies this rule is that a prior out-of-court statement has not been made in the presence or hearing of the party against whom it is sought to be used and was not elicited under circumstances which permitted exploration of the witness's perception, memory, or prejudice. Therefore, under the orthodox rule, the only authorized use of a prior statement is to neutralize contrary testimony at trial. *Jaggie v. Davis Colliery Co.,* 75 W. Va. 370, 84 S.E. 941 (1914); *Wilson v. McCoy,* 86 W. Va. 103, 103 S.E. 42 (1920); *State v. Carduff, supra.*

Numerous legal scholars, including Professors Wigmore and McCormick have vigorously criticized the orthodox rule. 3A Wigmore, *Evidence* §1018(b). (Chadbourn rev. 1970); McCormick, "The Turncoat Witness: Previous Statements as Substantive Evidence" 25 *Tex. L. Rev.* 573 (1947). The academic criticism is based upon the inapplicability of the traditional hearsay rationale for excluding such statements because the witness is available for examination at trial. However, this Court is not persuaded by this logic because cross-examination is unavailing when the witness's stock response to all questions is, "I don't remember." Although the jury would be free to determine how much weight they should accord the prior statement as opposed to the present in-court testimony, there is little choice when the in-court testimony consists merely of an averment of loss of memory.

Most courts are in agreement on this point and have been reticent to reject the orthodox rule[5] in favor of the academic position because of the inherently questionable nature of prior statements, particularly those made to police officers under coercive circumstances. The controversy regarding this issue surfaced during the adop-

tion of the *Proposed Federal Rules of Evidence.* An early draft of *Proposed Federal Rule* 801(d) provided:

> "A statement is not hearsay if—(1) Prior Statement by Witness,—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. . . ."[6]

However, as approved by Congress, Rule 801(d) reads:

> "(d) Statements which are not hearsay.—A statement is not hearsay if—
>
> "(1) Prior statement by witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was *given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition,* or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . ." (Emphasis supplied). *Fed. Rules Evid. Rule 801, 28 U.S.C.A.*

Judge Friendly of the Second Circuit was in large part responsible for the development of the new direction in the use of some prior inconsistent statements made under oath as substantive evidence. While most courts adhered to the use of prior inconsistent statements for

---

[5]For illustrative cases applying the orthodox rule *see, United States v. Briggs,* 457 F.2d 908 (2d Cir. 1972); *United States v. Small,* 443 F.2d 497 (3d Cir. 1971); and *United States v. Allsup,* 485 F.2d 287 (8th Cir. 1973).

[6]*Rules of Evidence for United States Courts and Magistrates,* Rule 801(d)(1), 56 F.R.D. 183, 293 (1972). For earlier drafts of the *Proposed Federal Rules, see* 51 F.R.D. 315 (1971) and 46 F.R.D. 161 (1969).

impeachment purposes only, in a series of opinions by Judge Friendly, prior courtroom or grand jury testimony may now be used in Federal Courts, at least in the Second Circuit, as substantive evidence.

Judge Friendly's series began with the case of *United States v. Kahaner*, 317 F.2d 459 (2d Cir. 1963), *cert. denied*, 375 U.S. 836 (1963), where the case against the defendant rested entirely on the testimony of two government witnesses, both of whom had implicated the defendant in their grand jury testimony. One of these witnesses testified at trial consistent with his grand jury testimony, but the other did not. In fact, the trial testimony of the second witness was entirely exculpatory as to the defendant, and directly contrary to the witness's grand jury testimony. The government then attempted unsuccessfully to refresh the witness's memory. The government claimed surprise and was permitted to question the witness with regard to his previous answers before the grand jury. The court instructed the jury that "to the extent that any evidence was elicited from this witness of his prior testimony before the grand jury, that is not to be treated as affirmative proof of the fact," but rather "together with his current trial testimony, only goes to the issue of his credibility on these matters." The Second Circuit held that the defendant was not entitled to a reversal upon the assertion that the jury was asked to accept grand jury testimony rather than trial testimony as the prosecution had met the requirements of surprise and the jury had been properly instructed as to the nature of the evidence. So far Judge Friendly was consistent with the orthodox rule.

One year later, Judge Friendly again reached this issue in his opinion in *United States v. De Sisto*, 329 F.2d 929 (2d Cir. 1964), *cert. denied*, 377 U.S. 979 (1964), where a witness for the government had been the driver of a truck allegedly hijacked by the defendant and several other men. The driver had picked the defendant out of a line-up four days after the hijacking, and had made a

positive identification of the defendant before a grand jury, at an earlier trial, and on other occasions. On retrial 3-½ years later, the witness expressed doubt as to the identification because of cross-examination regarding tattoos on the arms of the defendant which the witness had not identified in his original description of the defendant, but which, according to trial testimony, would have been in full view of the driver during the perpetration of the crime. Judge Friendly treated the issue this way:

> "The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as 'pious fraud' ... 'mere verbal ritual'. ... The sanctioned ritual seems peculiarly absurd when the witness who has given damaging testimony on his first appearance at trial denies any relevant knowledge on his second; to tell a jury it may consider the prior testimony as reflecting on the veracity of the later denial of relevant knowledge but not as the substantive evidence that alone would be pertinent is a demand for mental gymnastics of which jurors are happily incapable." *De Sisto, supra*, at 933.

As a basis for his decision permitting grand jury and prior trial testimony to be used as substantive evidence, Judge Friendly cited a United States Supreme Court opinion in the case of *Bridges v. Wixon*, 326 U.S. 135 (1945). In *Wixon* one of the parties sought to introduce statements made during an investigative interview which were "simply stenographer's notes ... whose accuracy was denied." The court stated that

> "A written statement at the earlier interviews under oath and signed by [the witness] would have afforded protection against mistakes in hearing, mistakes in memory, mistakes in transcription. Statements made under those conditions would have an important safeguard—the

fear of prosecution for perjury." *Wixon, supra,* at 153.

Friendly asserted that the fears expressed in *Wixon* regarding potential mistakes were inapplicable to the *De Sisto* case as the testimony sought to be introduced in *De Sisto* was transcribed by a court reporter before a grand jury or at a former trial. Friendly, therefore, made a specific exception with regard to testimony at a former trial and prior grand jury testimony.

> "Testimony at a former trial has already been once subjected 'to the test of Cross-Examination' on which our law places primary reliance for the ascertainment of truth. ... Both such testimony and evidence before a grand jury have had the sanction of what Wigmore calls the 'prophylactic rules' relating to the oath and to perjury ... with the oath administered not in any perfunctory fashion but in a setting calculated to impress the witness with the gravity of the responsibilities assumed. And in the case of identification testimony, we think the exception to the orthodox rule which seems to be permitted by the *Bridges* opinion may properly embrace not only testimony so given but the even more probative consistent earlier identifications for which the witness has later vouched under oath in the secrecy of the grand jury room or at a former trial. ..." *De Sisto, supra,* at 934.

## B

West Virginia has long followed the orthodox rule that contradictory statements by a witness regarding material facts are admissible for the purpose of weakening or destroying the value of his testimony but are not admissible as primary evidence of the controverted fact. *Jaggie v. Davis Colliery,* 75 W. Va. 370, 84 S.E. 941 (1914); *Wilson v. McCoy,* 86 W. Va. 103, 103 S.E. 42 (1920); *State v. Carduff,* 147 W. Va. 18, 93 S.E.2d 502 (1956). Although this opinion writer's dissent in *State v. Fischer,* _____ W. Va. _____, 211 S.E.2d 666 (1974) might imply that in that case the Court deviated from its long established

tradition in this regard, the Court is of the opinion that the *Fischer* case stands exclusively for the proposition that under the unique set of facts in that case there was enough other credible evidence, excluding the out-of-court statement of the primary witness, to permit the case to go to the jury.

This Court is persuaded that the reasoning behind the new Rule 801(d) of the *Federal Rules of Evidence* and the line of cases cited *supra* from the Second Circuit is compelling with regard to the admissibility at a subsequent trial of prior in-court statements made under oath and subject to cross-examination. We are not, however, persuaded that a similar exception should be made with regard to any *ex parte* statement made under oath, including grand jury minutes. While the Court recognizes that criminal defendants can often bring pressure to bear upon witnesses to compel a convenient loss of memory during the trial of a case, the sinister spectre of coerced statements made to the police in an *ex parte* manner is far more threatening. Frequently witnesses in criminal cases are implicated in the criminal activity at issue, as in the case at bar, and the prosecutorial authorities can induce fear, a sense of guilt, and panic, in such a way as to cause distortion of the facts. In addition, out-of-court statements are subject to errors in transcription, outright misstatement by the officer preparing the statement for signature, and the errors of perception which are inherent in responses to leading questions. Accordingly, while prior statements made under oath in a judicial atmosphere either by deposition or at a prior trial and which have been subject to cross-examination by the defendant's counsel are admissible for the truth of the matter asserted, all other out-of-court statements may be used exclusively to impeach credibility and should be used sparingly in that regard. Trial judges should greatly circumscribe the extent to which such out-of-court statements are used. In the case at bar there was a great abuse of discretion because twenty-six separate statements were admitted into evidence. While an adverse party may impeach any specific

statement made by a witness, the impeachment exception to the rule against admitting out-of-court statements should not be used as a ruse for introducing damaging material about which the witness did not specifically testify.

## II

The second question presented in this case concerns the legitimacy of a court instruction for the State which told the jury that they should receive the testimony of Loren Bane—a defense witness who exculpated the defendant—with caution because Bane might not be considered an innocent agent but rather a co-conspirator. Bane was admittedly present and participated in the taking and carrying away of the bulldozer.

As this Court said in *State v. Betsall,* 11 W. Va. 703 (1877) "one of the brightest ornaments" of Virginia and West Virginia jurisprudence is the absolute prohibition with regard to a judge commenting upon the weight of the evidence. This has always been the law in West Virginia, is the law today, and shall remain the law for as long as this Court as currently constituted shall sit. There is an exception to this salutary rule of which our jurisprudence is so proud, and that was made because of the extreme coercive power of the State by virtue of its prerogative to prosecute or decline prosecution of co-conspirators. Thus in *State v. Humphreys,* 128 W. Va. 370, 36 S.E.2d 469 (1945) it was recognized that when uncorroborated testimony of an accomplice is used to inculpate a defendant, the court should instruct the jury that such testimony should be received with great caution.

This exception to judges commenting upon the weight of the evidence has been removed from the area of a discretionary comment and made a firm rule of the law as a result of long experience. *Guthrie v. Commonwealth,* 171 Va. 461, 198 S.E. 481 (1938). It is well recognized that while a defendant may inspire either fear or affection in his former accomplices, the State inevitably inspires fear in those same accomplices by virtue of its preroga-

tive to prosecute. While a defendant may suborn perjury in an accomplice, his capacity in this regard is no greater than with any other witness in the case; however, the State is in a unique position to suborn perjury with accomplice witnesses, again because of its power to prosecute. While there is every reason to believe that an alleged accomplice would inculpate the defendant to obtain more favorable treatment for himself, there is no reason to believe that an accomplice would be more disposed to lie for the benefit of the accused than would be the accused's wife, brother, mother, or an entire host of other people with whom the accused might have ties of affection. The accused might be able to intimidate an accomplice, but not to any greater extent than he could intimidate any other witness. We hold, therefore, that while the defendant is entitled to an instruction that the uncorroborated testimony of a co-conspirator should be received with great caution, the State is not in any regard entitled to a similar instruction when the testimony of the accomplice tends to *exculpate* the defendant.

Upon review of the entire record of this case, the Court concludes that there was enough circumstantial evidence excluding the inadmissible out-of-court statements of John Boyce to justify submitting the case to the jury. However, because of the errors discussed above the judgment of the Circuit Court of Marion County must be reversed and the case remanded for a new trial.

*Reversed and remanded*
*for a new trial.*