## ALEX JOHNSON v. STATE.

No. A-4293.    Opinion Filed Nov. 24, 1924.

(230 Pac. 525.)

(Syllabus.)

1.  **Evidence—Judicial Notice of Ku Klux Klan's Unfriendly Relations Toward Negroes.** The courts may take judicial notice that the Ku Klux Klan and its members in this state sustain unfriendly relations towards some of the fiscal, social, and political aspirations of certain classes of citizens, including negroes.

2.  **Jury—Prospective Juror in Prosecution of Negro—Examination as to Ku Klux Klan Membership.** In the examination of jurors on their voir dire, in a case where a negro is charged with the larceny of live stock in a community surcharged with racial animosity which had resulted in hostile demonstrations against the negro race, presumably fostered by the Ku Klux Klan, the prospective jurors may be asked if they are members of that order and whether they are bound by any oath, rule, or obligation of the order amounting to bias, express or implied.

3.  **Same.** Where an inquiry is made in good faith, predicated upon probable cause indicating that the rights of the accused may be affected, counsel for the defendant may, within reasonable bounds, limited by a fair discretion of the court, interrogate prospective jurors as to their membership in the Ku Klux Klan, in order that the accused may intelligently exercise his right to challenge jurors for cause, or peremptorily without cause, in such manner as will facilitate the selections of a jury that is in fact impartial.

Appeal from District Court, Muskogee County; Benjamin B. Wheeler, Judge.

Alex Johnson was convicted of the larceny of live stock, and he appeals. Reversed and remanded.

W. E. Disney and John Wheeler, for plaintiff in error.

The Attorney General, for the State.

BESSEY, J.  Alex Johnson, a negro, was convicted in the district court of Muskogee county of the crime of larceny of live stock.  On October 9, 1921, he was sentenced to confinement in the state penitentiary for a term of two years.  In this appeal the accused claims that he was unjustly deprived of his right to the selection of an impartial jury.  The chief question for the consideration of this court is whether or not the defendant's right to a trial before a fair and impartial jury was denied or impaired.

The defendant was a negro, and claims that certain of the jurors selected to try him were members of the Ku Klux Klan, a secret order or organization, the members of which are bound under oath to discriminate against the free and unrestricted rights of citizenship belonging to the defendant and his race. He complains that upon examination of some of the jurors who admitted membership in this order they refused to answer questions concerning the oath or obligation of the order relating to the objects and purposes of the order, thereby indicating that they considered the oath and obligation of the order paramount to their obligations as jurors to disclose in open court what their qualifications as jurors might be in this regard.  Defendant complains further that in the course of the examination of prospective jurors, when the eighth juror was about to be examined, the court arbitrarily ruled that counsel for defendant would not thereafter be permitted to inquire of any of the prospective jurors as to whether they were members of the Ku Klux Klan, thus impairing the defendant's right to challenge for cause and to intelligently exercise his peremptory challenges.

The incidents complained of arose in this wise: The juror first examined said he was a member of the Klan, and that

he was not a member of the Anti-Horse Thief Association. The juror next examined said he was not a member of the Klan. The third juror examined was a Mr. Scarborough, and we quote from that portion of the examination of this juror which relates to the question here involved.

"Q. Are you a member of the Ku Klux Klan? A. Yes, sir.

"Q. In good standing? A. Yes, sir.

"Q. Mr. Scarborough, are you permitted by the tenets of the order to answer whether or not there is an oath of the Ku Klux Klan to enforce the law? (No answer.)

"Q. You are not permitted by your oath to answer that question? (No answer.)"

Without requiring the juror to answer these questions, the challenge to his competency was by the court overruled. A portion of the examination of the fourth juror is as follows:

"Q. Are you a member of the Ku Klux Klan? A. Yes, sir.

"Q. How long have you been a member? A. Several months.

"Q. Are you a member in good standing now? A. Yes.

"Q. Does the order permit you to answer this question, Mr. Reid; did you take an oath on initiation or at any other time, in your lodge or order, to enforce the law or look after the enforcement of the law—I will ask you first if the order— if your order permits you to answer that question? A. No, I believe not.

"Q. So it does not permit you to answer the question? A. No.

"By Mr. Disney: We challenge the juror for cause.

"By the Court: Overruled.

"By Mr. Disney: Exception."

The fifth, sixth, and seventh jurors said they were not members of the Klan. Counsel inquired of the eighth juror whether he was a member of the Klan, to which question an objection was interposed by the state, followed by a lengthy colloquy between the court, the county attorney and counsel for the defendant, "on what grounds do you challenge the juror?"

"By Mr. Disney: On the ground that, as I understand it, from information both hearsay and through the press, particularly as to the condition like the one that happened up at Boynton here recently, and then of the man early in the year being whipped out at Brushy Mountain, where the press intimated that the Ku Klux Klan had something to do with it—your honor will remember that Judge Thurman, in passing on a similar question; held that that was a proper question to ask, and I can cite you the authority on it."

After a short recess and further discussion, during which the jury were excused, the court made the following ruling:

"By the Court: After examining the law in this case, the court is of the opinion that the objection of the county attorney is good and will sustain the objection to this extent. The court is of the opinion, and now holds, that in the examination of jurors it is perfectly proper to ask if a certain juror believes in certain principles, but not ask if—it is not proper to ask the juror if he belongs to certain organizations. For instance, it would be perfectly proper to ask the juror if he believed in the principles of religion taught by Christ, or whether the juror rejected the teachings of Christ; it would be perfectly proper to ask if the juror believed in the principle of religion which required immersion in order to be saved, or whether the juror believed that immersion was not necessary, in case that question was involved in the trial of the case, or if for any other reason counsel wanted to be advised upon that question—it would be perfectly proper to ask if the juror belonged to any organization which has for its purpose the disfranchisement of the negro, but not proper to ask if the juror belongs to any specific organization, and that will be the ruling of this court."

To this ruling of the court the defendant excepted.

Following this nine more jurors were examined as to their qualifications. How many of these were members of the Klan does not appear, for the reason that the court would not permit inquiries in that regard. Upon this point the court said:

"Let the record show that counsel for the defendant is not permitted to ask that question, and the record may show that they want to ask each juror whether he is a member of the Ku Klux Klan. Let the record show he asks to be permitted to ask all the jurors the question as to whether they belong to a certain named organization, the Ku Klux Klan, and the request is denied and the defendant excepts."

This is the first time this court has been called upon to determine the effect of organized racial and religious differences as they apply to the qualifications of jurors. The question is a delicate one, to be approached with extreme caution, but with a firm determination to eliminate any prejudice that might be entertained by the members of this court, and to announce the law as it is without regard to public clamor or popular approval.

The right to a fair trial by an impartial jury may be said to be the keystone of the arch supporting the superstructure of our Constitution. The right to a trial by a jury would be a mere delusion, a false pretense, where a jury is composed of partisans with fixed, preconceived notions of what should be done to an accused person on account of his race or his religious beliefs. Through all ages religious and social animosities have been more productive of discord, bloodshed, and social anarchy than any other agency. In this character of controversy, more than in any other, sound reason is often displaced by bitter intolerance. These things must have been in the minds of our patriot forefathers, when they wrote into the Constitution that religious liberty should never be abridg-

ed, that titles of nobility should never be granted, and that equality of rights and opportunity to all citizens should be held inviolate. These cardinal principles still remain in the Constitution, as the supreme law of the land, binding alike upon all citizens, societies, officers, and courts; it applies to negroes who, like other citizens, are entitled to the equal protection of the law.

It is claimed by the state that the trial court did not abuse his discretion in limiting the examination of the jurors to the extent and in the manner shown by the record. The defendant claims that the record does indicate to some extent that the members of the order known as the Ku Klux Klan are bound by some kind of oath or obligation and that its members are not permitted by this oath and the tenets of the order to disclose the methods, purposes, and activities of the order, which is commonly reputed to be hostile to the legal rights and privileges of negroes; and that the court, in the examination of nine of the jurors, denied or impaired the right of the defendant to make reasonable inquiries in this regard.

The defendant urges that because of the agitation, discord, and racial discrimination and hatred, extending in some instances to physical chastisement, purporting to emanate from this organization in recent times, and because of the widespread knowledge of these conditions disseminated by the public press, from the pulpit and the rostrum, the court should take judicial notice that the purposes and activities of the organization and its members are inimical to the rights of the negro race, and therefore of this defendant.

It has been held that well-known matters affecting social, political, and religious conditions may be recognized by the courts without proof. Thus courts will take judicial notice, without proof, of the fact that there are numerous sects, main-

taining different conflicting doctrines, and of the creed and general doctrine of each sect; that some of them believe in the doctrine of predestination, while others do not; that some adhere to the doctrine of eternal punishment of the wicked, while others repudiate it; that some believe in the doctrine of Apostolic succession and the authority of the priesthood, while others reject both; that the Jewish people deny the inspiration and authority of the New Testament and the divinity of Christ. 15 R. C. L. 1125-1127; 23 C. J. 160. This principle of judicial knowledge without proof may be applied to local conditions extending over a sufficient period of time as to become generally well known. 23 C. J. 122; 15 R. C. L. 1121.

It has been held that it is no ground for challenge for cause to show that a juror is a member of some order or lodge organized for the detection or suppression of crime, although such membership may be shown to enable a defendant to exercise his peremptory challenges more intelligently. 16 R. C. L. 277; annotations, 31 A. L. R. 411.

The principle of judicial notice without proof will apply to only those features and purposes of an organization that are so well and commonly known as not to require proof, but will not apply to the details and ramifications of all its operations in the concrete. All the facts that may be disputed must be established by proof. For instance, the courts will not take judicial cognizance of the imperial powers and functions of a Grand Dragon; courts do not know judicially what a Cyclops is, or does, or will do for or to a litigant. But the courts may take judicial notice of the fact that the activities and purposes of this society generally bear an unfriendly relation to the rights and privileges claimed by Catholics, Jews, and negroes. By the same rule the courts may know judicially that this order and its members have been actively implicated in wide-

spread social, religious, and political controversies, often to such an extent as to impair the free exercise of fiscal, social, and political rights of others, amounting in some instances to business and financial boycotts.

Through the press and from the platform, as well as in private conversation, this order and its mysteries have been vigorously defended and denounced, criticized and vindicated, and in these respects it differs from the organizations involved in most of the cases so far decided. But the very fact that its agencies and activities are so generally and bitterly controverted, and that those engaged in the controversy are inclined to become bitterly partisan, should not lessen, but, on the contrary, should emphasize the reasons why membership in the organization may be made a matter of inquiry in any case where the interests of one of the parties appear to be materially affected, in order that the person interested may intelligently exercise his right to challenge a hostile juror peremptorily or for cause. And these conditions, like a two-edged sword, may cut both ways. Those who foster unreasonable animosities against the members of this society, affecting business and social relations, may for the same reasons be disqualified as jurors in cases where the interests of members of the order are involved.

Sound reason would indicate that in a case like this, where such an inquiry is made in good faith, predicated upon probable cause, within reasonable bounds, limited by a fair discretion of the court, permission should be granted to interrogate prospective jurors concerning specific lodge affiliations that may have a tendency to impair the rights of the accused, to the end that he may be tried before a jury that is in fact impartial. Counsel should be limited and restrained from pursuing such inquiry in a captious manner; he should not be permitted to unnecessarily prolong the trial by inquiries of a

frivolous nature or concerning facts having only a remote or speculative bearing upon the qualifications of jurors. On the other hand, the court should be careful to refrain from arbitrarily depriving the accused of a fair opportunity to ascertain any bias, express or implied, that the juror may have or seem to have, in order that a challenge may be interposed for cause, or peremptorily, as the case may be.

In this case the defendant was entitled to five peremptory challenges, all of which he claimed. Had the defendant been permitted to pursue the inquiry, as he sought to do, he might have elicited information which would have enabled him to exercise his peremptory challenges to better advantage, and might have been able to successfully challenge for cause some one or more of the nine jurors who were not permitted to state whether they sustained affiliations with the Klan.

In the early history of California, 70 years ago, in the case of People v. Reyes, 5 Cal. 347, the court held as follows:

"A juror, being challenged for bias, was examined before triers and asked the following questions: First. Are you not a member of a secret and mysterious order known as, and called, Know Nothings, which has imposed on you an oath or obligation, beside which an oath administered to you in a court of justice, if in conflict with that oath or obligation, would be by you disregarded? Second. Are you a member of any secret organization, political or otherwise, by your oaths or obligations to which any prejudice exists in your mind against Catholic foreigners? Third. Do you belong to any secret political society known as and called by the people at large in the United States, Know Nothings? And if so, are you bound by an oath or other obligation not to give a prisoner of foreign birth, in a court of justice, a fair and impartial trial? Held that the court erred in ruling out those questions. The juror was also asked the questions: Have you, at any time, taken an oath or other obligation of such a character, that it has caused a prejudice in your mind against foreigners? Are you bound under any obligation not to extend the same

rights, privileges, protection, and support to men of foreign birth as to native-born American citizens? Have you any prejudice whatever against foreigners? Held that the court erred in ruling out the questions. Where a juror is challenged for actual bias, the triers are to determine the fact from the testimony, and any testimony which would lead to the conclusion that a bias existed in the juror's mind is competent testimony. Prejudice is a state of mind more frequently founded in passion than in reason. If he had taken oaths and was under obligations which influenced his mind and feelings in such a manner as to deny to a foreigner an impartial trial, he is grossly unfit to sit as a juror, and such facts should be known.''

In the case of Bethel v. State, 162 Ark. 76, 257 S. W. 740, 31 A. L. R. 402, it was held that for the purpose of laying a foundation for peremptory challenges of jurors they may be asked if they are members of the Ku Klux Klan, where counsel states that that organization is taking a particular interest in the prosecution in which they were called to sit as jurors.

In the case of Clark v. State, 154 Ark. 592, 243 S. W. 868, there was a showing made that there was antagonism between the Miners' Union and the Ku Klux Klan, by reason of the adoption of resolutions by the former condemning the latter. It was claimed that the passing of such resolutions by the Miners' Union disqualified its members from sitting as jurors in a trial in which members of the other organization were interested. There was nothing to show that the particular jurors were under actual bias; it was merely sought to show that they were members of the organization known as the Ku Klux Klan. It was held that the mere membership in committees or societies which are organized for the purpose of suppressing crime or the achievement of any particular purpose, does not of itself operate as a disqualification of a juror, unless it is shown that the particular individual has actual bias or is

directly connected with the matter under investigation in a way from which bias or prejudice will be implied. It does not follow, however, from the fact that the information to be elicited may not constitute disqualifying bias that the accused should be denied the right to propound the query; on the contrary, he was entitled to make the inquiry for the purpose of determining in what manner he should exercise his peremptory challenges.

In the case of Benson v. State, 95 Tex. Cr. R. 311, 254 S. W. 793, the court held that refusal to permit a negro defendant to ask the jurors on voir dire examination if they were members of the Ku Klux Klan was error, notwithstanding the fact that the prospective jurors stated that they belonged to no secret organization whose obligation would in any way interfere with or influence them against the defendant; and that the court should have permitted the question to be asked and answered in order to enable the defendant to elicit from them facts which would facilitate the exercise of his peremptory challenges in an intelligent manner.

In the case of Reich v. State, 94 Tex. Cr. R. 449, 251 S. W. 1072, it was held that, in a prosecution for manufacturing intoxicating liquor, where defendant's counsel requested permission to interrogate veniremen as to whether they were members of the Ku Klux Klan and stated that he believed that some of them were, and that the Ku Klux Klan had been discussing at their meetings numerous criminal prosecutions and insisting upon convictions and that he feared prejudice, it was error for the court to refuse permission to make such examination.

In Belcher v. State, 96 Tex. Cr. R. 382, 257 S. W. 1097, the court held that the trial court erred in not permitting accused to inquire of veniremen on their voir dire examina-

tion whether they belonged to the Ku Klux Klan, where counsel for the accused stated to the court that he needed the information in order that his peremptory challenges might be intelligently exercised; that the fact that the trial court permitted general questions as to membership in any organization which would influence their verdict was insufficient; and that there was an abuse of discretion in limiting inquiries to organizations in general.

In the Bethel Case, supra, it was said that it was not necessary for the accused, or his attorney, to first prove the grounds for interrogating the jurors, but that, on the contrary, if the questions were asked in good faith and were not merely captious or impertinent, the court should permit the inquiry to be made in order that the accused might intelligently and satisfactorily exercise his right of peremptory challenge; that mere membership in the order alone would not show that the inquiry was material, but that, where as in that case the defendant's counsel informed the court of the fact that there was positive antagonism between the membership of the organization to which the accused belonged and the one to which the propsed jurors belonged, he was entitled to ascertain the facts as to whether or not the jurors were indeed members of the other organization, so that he could determine in what instances he should exercise his right of peremptory challenge.

Applying the rules announced in the adjudicated cases cited to the facts in this case, we hold that the defendant should have been accorded greater latitude in the examination of jurors. So holding, it will not be necessary to treat of the other errors urged.

The cause is reversed and remanded.

MATSON, P. J., and DOYLE, J., concur.