## CHARLESTON.

STATE *v.* G. C. McMILLION

(No. 5771)

Submitted April 27, 1927.    Decided May 31, 1927.

1. INDICTMENT AND INFORMATION—*Murder Indictment in Statutory Form Omitting Date of Offense, Shown to be Prior to Its Return Date of Which Court Records Showed, Held Good on Motion to quash (Code, c. 144, § 1, c. 158, § 10).*

   An indictment for murder, drawn in accordance with the form prescribed by statute (Code, Ch. 144, § 1), alleging that the crime was committed "on the ........ day of September, 1925," and shown by the records of the court to have been returned on the 16th day of September, 1925, and its language plainly importing that the offense was committed prior to its finding, is good on motion to quash.  (p. 7.)

2. JURY—*Generally, Membership in Association Not Shown to be Interested in Prosecution Does Not Disqualify Juror; in Prosecution for Murder, Juror's Membership in Ku Klux Klan, Not Shown to be Interested in Prosecution, Held Not to Disqualify Him (Code, c. 116, § 17).*

   As a general rule it is no ground of challenge for cause, and does not disqualify a juror, simply because he belongs to some association or order, in the absence of a showing that the association or order is in some way interested in or connected with the prosecution of the case, where said juror otherwise qualifies upon the *voir dire* examination to serve as such.  (p. 8.)

3.   CRIMINAL LAW—JURY—*Qualification of Jurors is Question of Mixed Law and Fact, on Which Court's Finding Will Not be Set Aside Except for Clear Error; in Prosecution for Murder, Refusal to Sustain Challenges to Jurors Because Members of Ku Klux Klan Held Not Error (Code, c. 116, § 17).*

The question presented as to the qualification of jurors is one of mixed law and fact, and the finding of the trial court upon that issue will not be set aside unless the error is plainly manifest.   (p. 9.)

4.   SAME—HOMICIDE—*Generally if Court Errs in Instructions as to Higher Degree of Crime, Defendant Cannot Complain of Conviction of Lower Degree as to Which Instruction Was Proper; Defendant Convicted of Second Degree Murder, as to Which Instruction Was Correct, May Not Complain of Alleged Error in Instruction on First Degree Murder.*

The general rule is that, where a crime is divided into degrees, if the court commits error in instructing the jury as to the higher degree of such crime, and they return a verdict of guilty of a lower degree as to which they were properly instructed, the defendant cannot complain.   (p. 9.)

5.   HOMICIDE—*Verdict Adverse to Defense of Self-Defense Will Not be Set Aside Unless Manifestly Against Weight of Evidence; Evidence Held to Sustain Conviction of Second Degree Murder as Against Plea of Self-Defense.*

It is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence.   (p. 10.)

6.   SAME—*On Plea of Self-Defense, Burden of Showing Imminence of Danger Rests on Defendant Accused of Homicide; no Apprehension of Danger Previously Entertained Justifies Homicide, But Such Apprehension Must be Existing at Time of Firing Fatal Shot.*

Under his plea of self-defense, the burden of showing the imminency of the danger rests upon the defendant.   No apprehension of danger previously entertained will justify the commission of the homicide; it must be an apprehension existing at the time the defendant fired the fatal shot. (p. 10.)

HATCHER, PRESIDENT, absent.

Error to Circuit Court, Fayette County.

G. C. McMillion was convicted of second degree murder, and he brings error.

*Affirmed.*

*Harold W. Houston* and *W. R. Bennett*, for plaintiff in error.

*Howard B. Lee*, Attorney General, and *R. A. Blessing*, Assistant Attorney General, for the State.

WOODS, JUDGE:

G. C. McMillion was tried in the circuit court of Fayette county for the murder of one Estel Hatcher. He was found guilty of second degree murder, and sentenced to a term of eight years in the penitentiary, and now brings error to this court.

From the case made by the State, it appears that Goff Odell, a State prohibition officer, had secured a search and seizure warrant from C. M. Evans, a justice of Fayette county, for a Studebaker automobile operated by one Pat Flint, who, Odell was informed, was operating a still and disposing of intoxicating liquors in the neighborhood of John H. Hatcher, the father of the deceased. This officer informed the elder Hatcher that he would notify him of the time when he would come into the neighborhood to execute the warrant, and requested Hatcher to have some local officer present to assist him. Hatcher, who was interested in apprehending the bootlegger, upon the receipt of a letter from Officer Odell to the effect that the latter would go to Point Lookout, where the main road is intersected by the Harris road, and watch for the car operated by Flint, on the evening of September 10, 1925 (the date of the homicide), arranged with John D. Skaggs, a constable of the county, to go with him to meet Odell for the purpose of watching for and apprehending Flint. So, on the appointed evening, Hatcher and his son, Estel, accompanied by the constable, drove to the point designated, which is between two and three miles from the Hatcher home and store. Upon reaching the designated spot, Hatcher drove his car a short distance out the Harris road and parked it. Officer Odell, Constable Skaggs, both armed, and young

Hatcher, who was unarmed, stationed themselves along the side of the main road near its intersection with the Harris road. They watched for a car driven by Flint. Two cars were stopped, but found not to be the one wanted. They claim that they were in this position when the defendant's car, hereinafter referred to, started forward, after it had been passed by a certain car which had previously been stalled. As defendant's car approached the place where the officers were stationed, Estel Hatcher remarked, "There is the car!" meaning Flint's car, and officer Skaggs called, "Halt!" Whereupon defendant began to shoot from the side of his car. Young Hatcher immediately fell, fatally wounded by three bullets. The officers then returned the fire and the defendant's car speeded away. Young Hatcher was taken to the Oak Hill Hospital, where he died the following day.

The defendant relied on self-defense. To support his claim that he believed himself to be in imminent danger of death or great bodily harm at the hands of a mob at the time he fired the fatal shot, and that such shot was fired in good faith for the sole purpose of protecting his life and limb, he introduced a typewritten notice, signed "K. K. K.," which he states was served on him at his home one night about four months prior to the homicide, by eighty hooded men. This notice, purporting to have been given at the instance of six thousand determined Klansmen, directed that he resign his office as justice of the peace and leave the county within thirty days. This alleged demonstration occurred a few days after a colored man, charged with a grave offense against a white woman, had escaped from the custody of the defendant, while the latter was conveying him to the county jail at Fayetteville. However, the defendant in his testimony said that this hostile demonstration was a political scheme to drive him out of the taxi business, and that the escape of the colored man was taken as a pretext. On the evening of the homicide, defendant shows that he was returning to his home at Winona from Oak Hill, where he had gone that afternoon to attend Squire Woods' court, where his son, Richard, and Ernest Horrocks were wanted for some road violation. He was accompanied by his son Richard, Caleb Horrocks, Ernest Horrocks

(son of Caleb Horrocks) and Gordon Bandy. On the return trip he stopped at Fayetteville at a street fair until sometime after dark, when he and his party proceeded toward home in a touring car driven by defendant. Some distance out from Fayetteville, and near where the officers and deceased were stationed, defendant and his party observed an auto across the road ahead of them. Caleb Horrocks left the car of defendant to inquire concerning the reason for the car being across the road. Defendant at this juncture gave the wheel over to his son, Richard, and got into the back seat of his car. The man in the stalled car was having trouble, and Horrocks came back and called to defendant and his party that the man was all right, defendant having previously expressed his opinion that it was a "hold up," and that he was not going to stand for "any damned mistreatment." The car was removed from its position across the road by the aid of the elder Horrocks, and proceeded in the direction of Fayetteville until it had passed beyond defendant's car some little distance. According to defendant's testimony, someone hallooed "Halt!" and began firing towards his car from the direction of the car which previously had been stalled across the road; that defendant drew and leveled two pistols over the edge of his car and returned fire (some ten shots) in the direction of the hostile fire; that he was shot in the arm; that he then proceeded home and got in touch with the county officers.

Ernest Horrocks, an occupant of defendant's car, sustains the State's witnesses in their contention that defendant's car was going forward at the time the shots were fired, and that the defendant fired the first shots—firing "just as quick as the word [halt] was out of the fellow's mouth." Caleb Horrocks likewise corroborates the State to the effect that defendant's car was moving when the shooting occurred, and while the reports of the first shots came from the opposite side of the car from him he could not tell whether the same were fired on the outside or not, but that he could only see the flash. On being asked whether the car was moving rapidly or slowly at the time the first shots were fired, he replied that it was "moving very slowly, but he put the gas on it then and

went just as hard as he could.'' Horrocks endeavored to board the car as it passed, but failed. The defendant's contention as to who fired the first shots and that they came from behind the stalled car which had just passed is supported by his son Richard. Bandy, a young lad who lived with defendant, testified that upon seeing the stalled car ahead of them the defendant told Caleb Horrocks that it was a ''hold up'' and that he was going to ''take no rough treatment''; that Caleb got out and went up and saw who this fellow was, stayed there a good little bit and came back and told defendant that ''that fellow is all right''; and that Caleb then went back up to help him start the car. Bandy claims the defendant's car was standing still when they were fired upon. He states that he had taken a rifle, which the defendant had placed in his car before leaving home that afternoon, in his hands at the direction of the defendant and says that after the shooting began he climbed over the door and got on the fender of the car, tried to cock the rifle but failed, fell off the fender and ran into the bushes (dropping his rifle as he ran), where he secreted himself for the remainder of the night.

Testimony was offered by defendant to the effect that he and certain officers, on visiting the scene of the shooting on the following day between the hours of nine and twelve, observed a number of tracks—human and automobile—and found the ends of burnt matches and cloth, supposed to be sleeve lining, which appeared to be cut as if masks had been made from it. This testimony is met by the fact that two automobiles, carrying some sixteen or eighteen people, had gone to the scene soon after the shooting looking for Bandy, who had been an occupant of defendant's car and left as heretofore stated. An alleged dying statement of Estel Hatcher that his father, John Skaggs and about eighteen or twenty others were out there trying to catch a bootlegger, and that he was shot by defendant, is directly countered by the State's witnesses who were with young Hatcher at the time such statement should have been made, who state that no such declaration was made by him, and that he was not in condition at the time that such statement was said to have been made to make a rational statement. Evidence was adduced by the defense

to the effect that the wife of John H. Hatcher, when questioned by officers the morning following the homicide, denied any knowledge of the shooting. Against this the State put in evidence that the news of the distressing affair was designedly kept from her by the family, for fear of the result such knowledge would have upon her, in her then present physical condition. The State introduced divers witnesses impeaching the defendant's reputation for truth and veracity.

While the record is a voluminous one, covering over a thousand typewritten pages, the points of error ably stressed by counsel for the defendant in their brief and before this Court on the hearing are as follows: (1) Overruling defendant's motion to quash the indictment; (2) overruling defendant's challenges for cause to certain jurors; (3) giving the jury State's instruction No. 2, with reference to murder in the first degree; and that (4) the evidence did not support the verdict.

The indictment is in the statutory form for murder. It alleges the offense to have been committed "on the ............ day of September, 1925". The court at which the indictment was returned convened on the 15th day of September, 1925, and the order of the court shows it to have been returned on the following day. The evidence shows the offense to have been committed on the 10th day of September, 1925. At common law, it was necessary to set out the date of an alleged offense in an indictment. Our statute modifies the common law to the extent of providing that no indictment "shall be quashed or deemed invalid * * * for omitting to state, or stating imperfectly, the time at which the offense was committed when time is not the essence of the offense." Code, Chap. 158, § 10. In *State* v. *Pennington,* 41 W. Va. 599, this Court, in applying this statute, states the rule to be that, where no statute of limitation bars, the date of the offense may be wholly omitted from the indictment, unless it be one of the rare offenses where time enters into its essence. The reason for this is that, where there is a limitation, the date must be stated, so it appears that the offense is not barred. The offense here does not fall within either of the exceptions. Of course, it must appear from the indictment that the offense was committed prior to its finding. However, a formal state-

ment to that effect is not necessary where the language imports such fact. 22 Cyc. 314. The language in the indictment does plainly import such fact. The motion to quash was properly overruled.

The challenge to certain of the jurors went to five of the panel of twenty on the ground of membership in the order of the Ku Klux Klan. Three of the five stated they had been members of the order, but were no longer members thereof. Two stated that they were members of the order. As a general rule it is no ground of challenge for cause, and does not disqualify a juror, simply because he belongs to some association or order, in the absence of a showing that the association or order is in some manner interested in or connected with the prosecution of the case. 16 R. C. L. 275. It is the right of a defendant to have the jury composed of persons who have no interest in the case, have neither formed nor expressed any opinion, who are free from bias or prejudice and stand indifferent in the case. Code, Chap. 116, § 17. In this case while there was in evidence the fact that defendant was visited by a band of hooded men, as hereinbefore referred to, there was no evidence that such men were in fact Klansmen, other than the circumstance of their appearance; nor was there evidence connecting Odell, Skaggs, John H. Hatcher, or deceased, with the Klan. To the contrary there was evidence that neither of them had ever been affiliated with such organization. While not sufficient evidence to bring the case within the rule announced above, to entitle the defendant to a challenge for cause *per se*, nevertheless, the defendant putting in evidence the circumstance of such demonstration having been made, a case was established where counsel for the prisoner had a right in good faith to inquire of the jurors whether they were members of such an organization, in order to make a more intelligent exercise of the right of striking the jury. For this purpose, courts of other jurisdictions have held that under certain conditions it was error to refuse to permit such examination of jurors on their *voir dire* and to compel answers to such questions. *State* v. *Hoelscher,* (Mo.) 273 S. W. 1099; *Reich* v. *State,* 94 Tex. Cr. R. 499; *State* v. *Johnson,* (Okla.) 230 Pac. 525. The trial court must, how-

ever, exercise a large amount of discretion in passing upon the good faith of counsel in invoking this privilege. The court in the instant case interrogated the jurors separately, in the presence of counsel and the prisoner, and the counsel for the defendant were permitted to question the jurors fully as to membership in such organization. Our Court is committed to the doctrine, laid down generally by courts of other States, that mere membership in such organization does not *per se* disqualify a juror, who upon the *voir dire* examination otherwise qualifies to serve on the jury, and it appears that he never heard the charge against the accused discussed in any way, had never taken part in securing evidence for or aiding the State, knew nothing about the facts in the case, and was sensible of no bias against the accused. *State* v. *Lohm*, 97 W. Va. 652. We said in the last mentioned case that this is so, even where a representative of such organization, at the instance of several members thereof, procures affidavits and turns them over to the prosecuting attorney for use in a particular case. A reading of the record of such examination of the jurors in the instant case on their *voir dire* discloses a most painstaking effort on the part of the presiding judge to select a proper jury. The question presented as to their qualification is one of mixed law and fact.

The finding of the trial court upon that issue will not be set aside unless the error is plainly manifest. *State* v. *Larue*, 98 W. Va. 677; *State* v. *Toney*, 98 W. Va. 236; *Wormeley* v. *Comm.*, 10 Gratt. 658. The trend of recent decisions is in the direction of limiting, rather than extending the disqualification of jurors. Applying the doctrine of the quoted decisions, we cannot say that the Court erred in admitting the challenged jurors to the panel.

We now consider the defendant's complaint of the second instruction given to the jury at the instance of the State. It was the usual instruction given in murder cases, saying that in order to convict of first degree murder that it was not necessary that malice should have existed in the heart of the prisoner against the deceased, but that it might be inferred from the act, and that such malice may not be directed against any particular person but is sufficient if it shows a heart re-

gardless of social duty and fatally bent on mischief. *State* v. *Tucker,* 52 W. Va. 431; *State* v. *Welch,* 36 W. Va. 697. However, as the defendant was found guilty only of murder in the second degree, he has no cause for complaint. The general rule is that where a crime is divided into degrees if the court commits error in instructing the jury as to the higher degree of such crime, and they return a verdict of guilty of a lower degree, as to which they were properly instructed, the defendant cannot complain. *State* v. *Watson,* 103 W. Va. 482; *State* v. *Bailey,* 103 W. Va. 605, 14 R. C. L. 17; 14 Ann. Cas. 989.

The remaining question to be considered is whether the evidence supports the verdict. The theory of the defense was that, while his car was standing still and just as the "stalled" car passed him to a point behind his car, a body of men from behind the "stalled" car opened fire upon him; that the defendant returned the fire. The State contended that, after the "stalled" car passed the defendant's car, the car of the defendant was driven rapidly forward, and upon the appearance of the officers at the roadside and calling upon defendant to "halt," that instead of the defendant doing so, he opened fire upon the officers, and Estel Hatcher, who was unarmed but in company with the officers, fell mortally wounded as a result of the fusilade of shots from the defendant's weapons. The officers then returned the fire. Thus there was an issue of fact as to who begun the attack. On this vital point the testimony is in direct conflict. Under his plea of self-defense, the burden of showing the imminency of the danger rests upon the defendant. No apprehension of danger previously entertained will justify the commission of homicide; it must be an apprehension *at the time* the prisoner struck the blow. Horr. & Thomp. Cases on Self-Defense, 646; *People* v. *Lamb,* 41 N. Y. 360. The contention of the State was supported not alone by the two officers (Odell and Skaggs), but by young Horrocks who was an occupant of the defendant's car. The question of the sufficiency of an overt act or hostile demonstration to show a design real or apparent to do him great bodily harm, which would warrant the defendant acting in self-defense, was

purely a question for the jury. In determining this the jury were told to take into consideration the said alleged demonstration of the hooded men towards him and all the circumstances preceding the shooting. They were told that it was their duty to view the whole case from the standpoint of the prisoner and that he had the right to act upon appearances, and if those appearances afforded him reasonable grounds to believe and that he did believe that he was in danger of death or great bodily harm, and that at the time he fired the shot that took the life of Hatcher, he believed such an act necessary to avoid the apparent danger, to acquit him, although it might afterward turn out that the appearances were false, and that there was neither design to do him serious injury or danger that it would be done. This is law of universal application. The jury was fully instructed at the instance of the defendant upon every phase of the case. It is peculiarly their province to weigh the evidence upon the question of self-defense, and a verdict of the jury adverse to the defense will not be set aside unless it is manifestly against the weight of the evidence. *State* v. *Wolfe,* 99 W. Va. 694; *State* v. *Skaggs,* 99 W. Va. 89; *State* v. *Porter,* 98 W. Va. 390. If the question depends upon the weight of testimony or inferences and deductions from facts proved, the jury, not the court are exclusively the judges. That is the case here.

Perceiving no error prejudicial to the defendant in the conduct of the proceedings on the trial, we affirm the judgment.

*Affirmed.*