295 S.E.2d 814

**STATE of West Virginia**

v.

**Gary Frederick SCHAEFER.**

**No. 15431.**

Supreme Court of Appeals of West Virginia.

Sept. 17, 1982.

Silas B. Taylor, Asst. Atty. Gen., for appellee.

Jerald E. Jones, Jones, Williams, West & Jones, Clarksburg, for appellant.

PER CURIAM:

On the first day of November, 1980, the defendant, Gary Frederick Schaefer, while in his Harrison County home, shot and killed one Rodney Freeman. He was indicted for murder and tried and convicted of voluntary manslaughter. His motion for a new trial was overruled and the judgment provided by law was imposed, sentencing him to serve not less than one nor more than five years in the penitentiary. We granted this appeal from that judgment. Finding no reversible error, we affirm.

Defendant makes eleven assignments of error. Recognizing that his assignments are interrelated, he has grouped them into three general categories: the trial court should have granted his motion for a judgment of acquittal because the evidence did not establish beyond a reasonable doubt that he did not act in self-defense; the court should have directed a verdict on first and second degree murder and should not have given any instruction relating to murder because the evidence did not support a murder conviction, *e.g.*, Syl. Pts. 5, 6 & 7, *State v. Morris*, 142 W.Va. 303, 95 S.E.2d 401 (1956); Syl. Pt. 3, *State v. Hurst*, 93 W.Va. 222, 116 S.E. 248 (1923); and the trial court erred in giving an in-

struction permitting the jury to infer malice from his use of a deadly weapon and in refusing to give an instruction he offered advising the jury that there was no inference of malice if a person armed himself in self-defense.

## I.

Unlike most criminal appeals coming before this Court, the evidence is undisputed and, except for minor inconsistencies in the defense testimony, is not conflicting. Schaefer and his wife gave statements to the police about the shooting shortly after it occurred and did not contest the voluntariness of these statements. After an *in camera* hearing the court ruled the statements were voluntary and evidence about them was admitted without objection. Defendant, his wife, and a neighbor who was present at the time of the shooting testified in support of defendant's self-defense claim. Defendant introduced evidence of his good character and reputation, and evidence that Freeman had a character or reputation for being violent.

Following the shooting, Schaefer took his five-year-old son from the house and went to "Bobby's Lounge", where he spoke to the proprietor, a former Clarksburg police officer. The proprietor telephoned the Clarksburg Police Department and informed them that there had been a shooting at defendant's home. Two police officers picked up Schaefer and his son at the lounge and they accompanied the officers back to the residence. There they found the victim's body lying on the living room floor. The defendant's wife, who had been home at the time of the shooting, did not leave and was there when the officers and defendant arrived.

Schaefer testified that he had been acquainted with Freeman for only about two months prior to the shooting. The first time they met, Freeman stopped by defendant's home one evening to speak with one Steve Rosen, after having seen Rosen's car parked nearby. Rosen and his wife were visiting the defendant. Rosen owed Freeman money and Freeman, who was apparently having trouble with his car battery,

demanded the battery out of Rosen's car. Rosen finally agreed to give him the battery, after Freeman threatened to beat him up or kill him if he did not do so. Schaefer allowed Freeman in his home on subsequent occasions to watch television and loaned him small amounts of money, after Freeman had explained that he had no friends and had no place to go. He had acted decently.

There came a time when Freeman became troublesome again. A friend of Schaefer's had moved back to Clarksburg and had come over to his house to visit. Freeman came by and, despite being told by the defendant that he had company, walked through the front door and said, "well, your company is just about to leave." When the friend protested, Freeman hit him in the mouth, followed him out on the porch and pulled a gun out of his boot, cocked the hammer, and pointed it at him. After this incident, which occurred approximately a month before the shooting, Schaefer began making inquiries concerning Freeman's reputation for violence, and told Freeman he and his wife did not want him to come to their house again.

One evening about a week before the shooting, defendant and his wife returned home to find Freeman knocking on their front door. She said she could not take any more of Freeman's harrassment. Defendant drove her to a phone where she called the Clarksburg Police Department. A police officer arrived and directed Freeman to leave. The defendant's wife testified that Freeman returned later that evening after they had gone to bed, but she refused to let him.

On the evening when the shooting occurred, Schaefer, and his wife and child were sitting in the living room when Freeman arrived. They had been remodeling and there was no knob on the front door. Freeman knocked and responding to defendant's "who is it", pushed the door open, came in, and asked if he could borrow $10. When the defendant said he did not have any money, Freeman accused him of lying.

Freeman then turned to Mrs. Schaefer and accused her of saying critical things

about him to his wife. She denied it but Freeman insisted that she had; she got upset and went upstairs. Freeman kept demanding money and defendant continually repeated that he had none. About that time, Carolyn Cain Sprouse, a neighbor, arrived. She asked where the defendant's wife was and defendant told her she was upstairs. She placed her wallet on the TV set and went upstairs. Freeman then walked over and picked up her wallet. When she came back downstairs and was told that Freeman had her wallet, she asked Freeman to give it back. He said he did not have to and that he was going to take it. As he started to walk out the door, she said she would call her boyfriend and tell him about it. Freeman responded that she could go ahead and call him if she wanted to, because he was not afraid of him. Defendant told Freeman to give the wallet and money back.

Freeman then left and Ms. Sprouse repeated her statement that she was going to call her boyfriend. Freeman must have heard her because he kicked or violently threw the door open and began yelling "go ahead and call your boyfriend." At this point, defendant's son began crying. Defendant asked Freeman if he would please leave, noting that he had upset the boy. Freeman responded, "well, f..k your little boy and f..k you because I don't have to do what you say. You can't make me do anything." The defendant said: "please just leave, the boy is upset, you two go outside and argue if you want to argue over this." Freeman replied: "I don't have to do anything because of your little boy," and he kept repeating the same profane expression. The defendant said, "please don't argue in this house," only to hear the same response from Freeman. At this point Freeman started toward the couch where Ms. Sprouse and the boy were seated.

Schaefer jumped from his seat, grabbed a gun located on a cabinet in the dining room, and pointed it at Freeman, yelling "please don't". Freeman turned to look at him, and the defendant opened fire and didn't stop shooting until Freeman hit the floor.

Schaefer testified that he was afraid of Freeman; that he was upset by his conduct and could not get him to leave; that he was also worried because Freeman had been drinking; that at the time of the shooting, Freeman had his hand up in the air as if he were going to strike his son and that he was in fear for his son's life. Ms. Sprouse's testimony was consistent with defendant's version of the facts. Mrs. Schaefer was upstairs during the critical period just before the shooting, but her testimony concerning what she heard corroborated her husband's version of the incident. Defendant did not have a telephone in the house.

The deceased was six foot one and weighed 185 pounds, while the defendant is five foot seven and weighs 135 pounds. Freeman was shot five times, including wounds to the head, neck, chest, back and left arm. A pathologist testified that the bullet that struck the deceased in the back was the cause of death and that it could not be definitely determined which of the five shots had been fired first. The alcohol content of the deceased's blood was .14 percent and Valium and Quaaludes were found in his bloodstream.

## II.

The question of whether the defendant acted in self-defense was determined by the jury, which was fully instructed at the instance of the defendant upon every phase of the case. The jury was told that what one may lawfully do in the defense of himself when threatened with death or great bodily harm, he may do in behalf of a member of his family, and that the place where a person lives is his home or castle, and such person may repel by force in the defense of his person or the defense of a member of his family, one who manifestly intends and endeavors by violence to commit a crime upon either, and in such case he is not bound to retreat, and if he kills his adversary in so doing, it is justifiable self-defense.

They were advised that if they believed from the evidence that Freeman entered

the defendant's home by force and without authority, then under the law the defendant was entitled to defend himself and his son by force against Freeman in such manner as to secure himself and his son from all danger, and if they believed that defendant killed Freeman in an endeavor to defend himself or his son from bodily harm at the hands of Freeman, using only such force or means as appeared to him at the time to be reasonably necessary, then such killing is excusable and they should find Schaefer not guilty.

The jury was also told that if they found that the State failed to prove beyond a reasonable doubt that Schaefer did not act in self-defense or in the defense of his son, they must find the defendant not guilty. In other words, if the jury had a reasonable doubt whether the defendant acted in self-defense or in the defense of his son, their verdict must be not guilty. *See, e.g., State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1979).

They were also instructed that Schaefer's actions must be viewed from his standpoint at the time of the shooting and that if the evidence showed that he had reasonable grounds to believe and did believe that danger was imminent and that his conduct was necessary to protect himself or to protect his son from bodily harm, he was to be excused for shooting Freeman in self-defense and the jury should find him not guilty.

As this Court recently recognized in *State v. W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550, 557 (1981), a criminal defendant "may interpose the defense of self-defense in protecting a member of his family as well as in protecting himself." *See also, State v. Wilson*, 145 W.Va. 261, 114 S.E.2d 465 (1960); *State v. Zannino*, 129 W.Va. 775, 41 S.E.2d 641 (1947).

The defendant, however, cannot successfully rely on our decision in *W.J.B.*, in which we reversed a voluntary manslaughter conviction because the evidence did not establish beyond a reasonable doubt that the accused did not act in self-defense. In *W.J.B.* there was evidence of prior unprovoked assaults by the victim against the defendant and his family. The shooting

occurred when the victim kicked open the living room door and was confronted by the juvenile defendant who had armed himself with a shotgun. The defendant asked the victim to leave but he refused and continued to challenge the defendant to fight and even dared him to shoot. The victim had a knife, and was continually using profanity and making threats. He advanced toward the defendant whereupon he was shot and killed.

Here there was no prior history of assaultive behavior directed at the defendant or his family. The victim was not armed and his statements immediately prior to the shooting were not in the nature of express threats to do physical violence. The question of self-defense in this case depended upon inferences to be drawn from the proven facts. Both the next door neighbor and the defendant's child were seated on the couch and thus the jury might reasonably have found that the victim did not intend to strike the child but rather intended to strike the next door neighbor with whom he was having an argument concerning her wallet. Furthermore, the evidence does not show that the victim continued to advance toward the child after the gun was pointed at him and, in fact, the testimony of the defendant indicates the contrary. Hence, there are critical factual differences between the present case and *W.J.B.*, and we can not say the jury had to believe that Schaefer acted in self-defense.

■ The evidence does not create a reasonable doubt about whether the defendant acted in self-defense, and thus the trial court did not err in denying a judgment of acquittal.

■ We have traditionally stated that, "[i]t is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence." Syllabus Point 5, *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927). This general principle fully applies to this case.

**654**

### III.

The evidence supports the jury's verdict. In Syllabus Point 1 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), this Court reformulated the language of our traditional test for the sufficiency of evidence in a criminal case. There we stated:

"In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

The state's evidence was sufficient to convince impartial minds that Schaefer was guilty of voluntary manslaughter beyond a reasonable doubt. We are not convinced that the evidence was manifestly inadequate or that an injustice has been done. The jury made its determination, and its verdict is not manifestly against the weight of the evidence.

### IV.

Defendant's next contention is that government instructions relating to murder should not have been given because there was no evidence to support them. The state's instructions were accurate statements of the law and, even if the evidence did not warrant instructions on first and second degree murder, any error in giving them was not prejudicial and must be considered harmless. "The general rule is that, where a crime is divided into degrees, if the court commits error in instructing the jury as to the higher degree of such crime, and they return a verdict of guilty of a lower degree as to which they were properly instructed, the defendant cannot complain." Syllabus Point 4, *State v. McMillion, supra; see also, State v. Butcher*, 165 W.Va. 522, 270 S.E.2d 156

(1980); *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978).

### V.

Defendant's final contention is that the trial court committed reversible error in refusing to give his instruction to the effect that malice can not be inferred if a person arms himself to defend himself or a member of his family. In *State v. Putnam*, 157 W.Va. 899, 205 S.E.2d 815 (1974), we held that refusal to give such an instruction was harmless error when the defendant, being tried for murder, was found guilty of voluntary manslaughter. *Putnam* is controlling. The syllabus states in part:

"In a homicide case a jury verdict will not be reversed for the failure to give a proper instruction concerning malice which would apply to first and second degree murder under an indictment for first degree murder when the verdict returned is for voluntary manslaughter to which the refused instruction would not have applied...."

The judgment of the Circuit Court of Harrison County is therefore affirmed.

Affirmed.