331 S.E.2d 496

**STATE of West Virginia**

v.

**Mazeo CLARK.**

**No. 16131.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 1985.

Decided June 3, 1985.

S. Clark Woodroe, Asst. Atty. Gen., Charleston, for appellee.

R. Scott Long and David B. Shapiro, Spilman, Thomas, Battle & Klostermeyer, Charleston, for appellant.

MILLER, Justice:

Mazeo Clark was indicted for murder and convicted by a jury of voluntary manslaughter in the Circuit Court of Kanawha County. In urging reversal of his conviction, Clark's primary contentions are that the State failed to prove beyond a reasonable doubt that he did not act in self-defense and that the evidence did not support either a first or second degree murder instruction. For the reasons that follow, we affirm his conviction.

It is undisputed that between 7:00 and 8:00 o'clock on the evening of August 16, 1981, Clark shot and killed Gabe Gibens near a vacant lot where people frequently gather and drink alcoholic beverages located in the City of Charleston. Clark was about 49 years old at the time of the shooting. His height was about six feet and three inches and he weighed approximately 250 pounds. The victim who was 79 years of age stood five feet one inch in height and weighed 161 pounds. He was shot three times, all frontal wounds, in the abdomen area. His blood alcohol content as revealed by hospital records was .13 percent. Clark was also shot twice during the incident, suffering a superficial wound to the right knee and a wound to the left scrotum. After the shooting, Clark drove his car a few blocks to the emergency room of a nearby hospital, leaving the Smith and Wesson handgun that belonged to the victim at the scene.

The prosecution presented the testimony of one eyewitness, Robert Lewis, and Clark testified on his own behalf maintaining that he acted in self-defense. They gave different versions of how the shooting occurred, but both stated that a heated argument developed between the deceased and one Jerry Lacy, prompting the victim to reach for a handgun in his right front pocket.

Lewis who had been drinking alcoholic beverages earlier in the day, was sitting about two feet away from the victim, who was seated on a cinder block. When the argument reached the point that Lacy threatened to kill the victim if he pulled a gun, the victim drew a gun from his pocket. As he did so, however, the block turned over, causing him to fall and the gun to fire in some unknown direction. The victim then asked Lewis to help him up and Lewis asked for the gun.

Clark had been sitting in a station wagon with the door open some fifteen yards away. Although Lewis did not see Clark approach the victim, he saw Clark attempt to kick the gun from the victim's hand, but he missed and fell on top of him. According to Lewis, Clark told the victim to give him the gun, but the gun went off and Clark was wounded somewhere in the leg. Lewis testified that it looked like the victim had the gun at the time. Then, both of them had their hands on the gun, and Clark was able to turn the gun toward the victim and another shot was fired. At that point, Lacy ran up from behind a tree and dived on the victim's head. Clark was still lying across the victim's body. As Lacy was getting up, another shot was fired. Because Lewis was fleeing to protect himself, he did not see the final shot fired.

Clark testified that at about 3:30 in the afternoon he had walked down to the vacant lot to repair his daughter's car which was parked on the lot. He saw Lewis, who had a half-gallon jug of some type of alcoholic beverage, sitting with several other people, including the victim and Lacy. They were approximately ten to fifteen

feet away. When he finished working on the car around 7:30, he sat down in the driver's seat. A short time later, the argument began and Lacy moved near the car. Clark got out and walked around to the front of the car thinking there might be trouble because he knew that when the victim was drinking he was a dangerous man. He had known him for years and regarded him as a friend.

When the victim tried to pull his gun, it stuck in his pocket and he fell. He could not get up. He reached out a hand and asked Lewis to help him up and when Lewis, who was sitting with his head down, did not respond, Clark started toward the victim, and said, "This is Mazeo, I'll help you up." According to Clark, he did not know the victim had gotten the gun out of his pocket. Clark estimated that he had taken only two or three steps when the victim turned and shot him.

Clark testified that after being shot, he believed that the victim would kill him if he tried to run back and hide behind the car. Consequently, he decided that his only chance was to disarm the victim. Clark stated that he was shot again as he went toward him, but his momentum carried him on top of the victim. At this point, the victim stuck the gun in his face and the gun clicked several times. Clark also testified that Lacy ran to help him, but Clark told him to get away as he thought Lacy was drunk. Clark said he then turned the gun on the victim, who pulled the trigger shooting himself. According to Clark, he then put his hand over the victim's hand and squeezed his trigger finger causing two more shots to fire. With the third shot, the struggle ended.

Clark explained his inability to disarm the much older and smaller man by saying that he was disabled from being shot and that he believed the victim was in better shape than he was. Clark denied trying to kick the gun from the victim's hand and stated that he was shot twice before he reached the victim. On cross-examination, he denied hearing Lacy ever threaten the

victim with a knife and said that he was only about ten to twelve feet away from the victim when he was shot the first time. He also stated that he was getting light-headed while struggling over the gun and that he knew that he had to act quickly or the victim would kill him.

The prosecution cross-examined Clark with a prior unsigned statement that he had made a few days after the shooting to an investigator and a stenographer employed by the Charleston Police Department. Clark said it contained three or four errors.[1] In contrast to his trial testimony, Clark reportedly said in the statement that he had his finger on the trigger when the victim was shot the last time. Clark denied making this statement. On rebuttal, to confirm the accuracy of the statement, the State called the detective and the stenographer who took down Clark's statement in shorthand and later transcribed it.

The prosecution's firearm's expert, Ralph Langley, established that the weapon used in the shooting held five rounds and that the five fired cartridge cases submitted to him by the city police department had been fired from the weapon. He also expressed the opinion from the unburned powder marks found on the blue cut-off shorts Clark was wearing that his findings were consistent with a man having his leg in a raised position when he was shot. He was further of the opinion that the shot was fired from a maximum distance of five to six feet and a minimum of two feet. The Assistant Medical Examiner for West Virginia also testified for the prosecution that two of three bullet wounds to the victim would individually have been fatal.

■ Considering the evidence in the light most favorable to the State, as we must, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), we conclude that there is sufficient evidence from which the jury could have found beyond a reasonable doubt that the killing was not done in self-defense. The State met its burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, as

---

1. Clark was never afforded an opportunity to sign the prior statement. He did sign a standard waiver of rights form before making the statement to the police investigator.

required by our holding in Syllabus Point 4 of *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978). Our decision is based on the evidence of the great physical disparity between Clark and the victim and the fact that the victim was of advanced age and under the influence of alcohol at the time he was shot. The jury could have found that at the time Clark shot and killed the victim he had gained control of the weapon and could not reasonably believe he was protecting himself from imminent danger of death or bodily injury. Similarly, the jury could have found that Clark acted unnecessarily and unreasonably in shooting or causing the victim to shoot himself both the second and the third time.

■ Imminent danger of serious bodily injury or death is a basic requirement of the law of self-defense. We stated in *State v. W.J.B.*, 166 W.Va. 602, 606, 276 S.E.2d 550, 553 (1981), that:

"[A] defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself. *See State v. Kirtley*, [162 W.Va. 249, 263 n. 8], 252 S.E.2d 374, 381 n. 8 (1978); *State v. Green*, 157 W.Va. 1031, 206 S.E.2d 923 (1974); *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243 (1957); *State v. Preece*, 116 W.Va. 176, 179 S.E. 524 (1935); W. LaFave & A. Scott, *Criminal Law* § 53 (1972)."

Once the danger has passed and the defendant can no longer reasonably believe that he is in danger, the law does not excuse the taking of a human life. The law stated in Syllabus Point 6 of *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), is particularly pertinent to the facts in this case:

"No apprehension of danger previously entertained will justify the commission of the homicide; it must be an apprehension existing at the time the defendant fired the fatal shot."

*See also State v. Collins*, 154 W.Va. 771, 781, 180 S.E.2d 54, 61 (1971).

Based on this fundamental principle, it has been stated that a person is not justified in shooting or employing a deadly weapon after the adversary has been disarmed or disabled. *People v. McBride*, 130 Ill.App.2d 201, 264 N.E.2d 446 (1970); 40 C.J.S. *Homicide* § 131(b) (1944). After Clark gained control of the weapon and the imminency of the danger had passed, the jury rationally could have found that he no longer had any legal right to employ deadly force.

■ We have historically been reluctant to interfere with a jury verdict rejecting a claim of self-defense. In *State v. Schaefer*, 170 W.Va. 649, 295 S.E.2d 814 (1982), we affirmed a voluntary manslaughter conviction and quoted approvingly from Syllabus Point 5 of *McMillion* as follows:

"It is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence."

That rule is also applicable here. The jury's voluntary manslaughter verdict is supported by the evidence.

■ Clark's contention that the trial court erred in giving either a first or second degree murder instruction because the evidence would not support either verdict is also unavailing. Our settled rule, and the rule of virtually every other jurisdiction, is also found in Syllabus Point 4 of *McMillion*, which states:

"The general rule is that, where a crime is divided into degrees, if the court commits error in instructing the jury as to the higher degree of such crime, and they return a verdict of guilty of a lower degree as to which they were properly instructed, the defendant cannot complain."

*See also State v. Schaefer, supra;* Annot., 15 A.L.R.4th 118 (1982).

In view of the jury's verdict of voluntary manslaughter about which they were properly instructed on the law, we conclude under Syllabus Point 4 of *McMillion* that Clark is not entitled to a reversal.

Nor do we find any merit in the argument that the trial court committed reversible error by permitting the State to engage Clark in a reenactment of the shooting on cross-examination. It was within the trial court's discretion to control the extent of cross-examination. Syllabus Point 4, *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982). The reenactment was relevant to the issues in the case and did not deny him a fair trial or violate his privilege against self-incrimination. *E.g., State v. Egbert*, 227 Kan. 266, 606 P.2d 1022, *cert. denied*, 449 U.S. 965, 101 S.Ct. 379, 66 L.Ed.2d 232 (1980); Annot., 3 A.L.R.4th 374 (1981).

Clark's contention that the trial judge coerced the jury into reaching a verdict is manifestly without merit. The jury after having deliberated for slightly more than one hour returned to the courtroom and indicated that they had taken three votes. The judge told the jury foreman to reveal the votes without disclosing which way the votes were divided. Only a general objection to the trial court's proposed procedure was made. The foreman responded that they were divided by a ten to two vote and had made little progress since beginning their deliberations. The judge then advised the jury that this was a serious matter and instructed them to return to their deliberations and attempt, if they could, "without doing violence to anyone's conscience, to reach a verdict." About eighteen minutes later, the jury returned its voluntary manslaughter verdict.

On these facts, we must affirm the trial judge's actions. He said nothing to the jury which would cause or even tend to cause the minority to sacrifice their beliefs or opinions in order to arrive at a verdict. We held in Syllabus Point 2 of *State v. Johnson*, 168 W.Va. 45, 282 S.E.2d 609 (1981): "Where a jury has reported that it is unable to agree and the trial court addresses the jury urging a verdict, but does not use language the effect of which would be to cause the minority to yield its views for the purpose of reaching a verdict, the trial court's remarks will not constitute reversible error."

Clark next contends that the trial court erred by permitting the State to utilize a prior inconsistent statement to impeach his credibility and by not *sua sponte* giving a limiting instruction telling the jury not to consider his prior inconsistent statement as substantive evidence of guilt. No error was committed in this regard. The trial court following a suppression hearing correctly ruled that Clark's unsigned statement was admissible in evidence. The fact that he did not sign the statement went only to its weight, not to its admissibility.

Clark's reliance on *State v. Spadafore*, 159 W.Va. 236, 220 S.E.2d 655 (1975), is misplaced. In *Spadafore*, we adhered to the orthodox rule that the prior inconsistent extrajudicial statements of a witness who is not a party can only be used to impeach and cannot be considered as substantive evidence of the facts to which such statements relate. When a prior inconsistent statement is admissible for impeachment purposes, a cautionary instruction is given to the jury. Here, we are considering the use of a prior extrajudicial statement of a criminal defendant who is a party to the proceeding and, thus, *Spadafore* is inapposite.

A criminal defendant's confessions or admissions have historically been admitted in evidence to prove the truth of the matters asserted therein as an exception to the hearsay rule,[2] subject to an

---

**2.** Although the terms sometimes are used synonymously, there is a distinction between a confession and an admission. A confession is generally defined as a statement admitting or acknowledging all facts necessary for the conviction of the crime at issue. An admission, on the other hand, consists of an acknowledgment of a fact or facts tending to prove guilt but falling short of a confession to all essential elements of the crime. McCormick on Evidence § 144 at 362 (3d ed. 1984); F. Cleckley, Handbook on Evidence for West Virginia Lawyers § 52 at 348 (1978); 29 Am.Jur.2d *Evidence* § 523 (1967). As a practical matter, however, the distinction is of diminished importance as the admissibility of any incriminating statement made by a criminal defendant to the police during a custodial interrogation is subject to the strictures of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and must be voluntarily and intelligently made in the due process sense. In

**64**

initial inquiry that the defendant's constitutional rights were not violated and the statements were freely and voluntarily made.[3] *E.g., United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frink v. State,* 597 P.2d 154 (Alaska 1979); *State v. Powers,* 117 Ariz. 220, 571 P.2d 1016 (1977) (In Banc); *People v. Green,* 27 Cal.3d 1, 609 P.2d 468, 164 Cal. Rptr. 1 (1980); *Commonwealth v. Glass,* 486 Pa. 334, 405 A.2d 1236 (1979); *Land v. Commonwealth,* 211 Va. 223, 176 S.E.2d 586 (1970); *State v. Hall,* 31 W.Va. 505, 509, 7 S.E. 422, 424 (1888); 29 Am.Jur.2d *Evidence* § 611 (1967); 4 J. Wigmore, Evidence § 1048 (J. Chadbourn, rev. 1972); McCormick on Evidence § 144 (3d ed. 1984).[4]

 Under the foregoing authorities, Clark's statement was admissible as substantive evidence of guilt, that is, for the truth of the matters asserted therein. Consequently, there was no need for a cautionary instruction advising the jury that the statement was only admitted for the purposes of impeachment. The fact that the State did not introduce the statement in its case-in-chief did not foreclose the use of the statement on cross-examination. *See United States v. Porter,* 544 F.2d 936 (8th Cir.1976).

 Clark's contention that the trial court erred by restricting his cross-examination of one of the State's witnesses is without merit. The State had called a police investigator to give the height and weight of the defendant and the victim and their ages. The defendant sought on cross-examination to get into the details of his investigation. The State objected because this was beyond the limited scope of direct

examination. The court agreed and stated that the defense could make him its witness. In Syllabus Point 5 of *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982), we said:

"As a general rule, the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination."

*See also State v. Gum,* 172 W.Va. 534, 544, 309 S.E.2d 32, 42 (1983); Syllabus Point 4, *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982). We perceive there was no error in the court's ruling.

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Syllabus Point 3 of *State v. Smith,* 158 W.Va. 663, 212 S.E.2d 759 (1975), *overruled on other grounds, State ex rel. White v. Mohn,* 168 W.Va. 211, 283 S.E.2d 914 (1981), this point is recognized: "In relation to the admissibility of statements, concerning their voluntariness, made by one being interrogated by the police, no distinction can be drawn between statements which are direct confessions and statements which amount to admissions of part or all of an offense." *See also* Syllabus Point 5, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975). The distinction can be exceedingly attenuated where, as here, the defendant admits the commission of the acts charged but also makes additional factual assertions tending to justify or excuse the crime.

**3.** Similarly, in civil actions, where a party opponent makes out-of-court admissions, they may be admitted against him as substantive evidence, i.e., for the truth of the matters asserted. *Thornsbury v. Thornsbury,* 147 W.Va. 771, 131 S.E.2d 713 (1963); F. Cleckley, *supra,* § 52.

**4.** Under the West Virginia Rules of Evidence, which became effective on February 1, 1985, incriminating extrajudicial statements of a criminal defendant are admissible as admissions by a party-opponent, but such statements by definition are not considered hearsay. Rule 801(d)(2)(a).